**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT SCOTT, JR., | : | Civil No. 1:21-CV-01985 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BLOSSBURG BOROUGH, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court is the motion for summary judgment, Doc. 46, and the motion to deem facts admitted, Doc. 57, filed by Defendants Blossburg Borough ("Borough"), Shane Nickerson ("Nickerson"), Joshua McCurdy ("McCurdy"), and Patrick J. Barrett, III ("Barrett"). In the amended complaint, Plaintiff Robert Scott, Jr. ("Scott"), a former Blossburg Borough police officer, alleges disability discrimination and retaliation under the ADA and PHRA, FMLA interference and retaliation, First Amendment retaliation, and violation of the Pennsylvania Whistleblower Act. (Doc. 35.) He also requests punitive damages. (*Id.*) For the reasons that follow, the motion to deem facts admitted is denied, and the motion for summary judgment is granted in part and denied in part.

1

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Robert Scott began working full time for the Blossburg Borough Police Department in 2012, eventually achieving the rank of corporal.  (Doc. 47, ¶ 10; Doc. 52-2, ¶ 4.)  Defendant McCurdy is the police chief of Blossburg Borough Police Department.  (Doc. 47, ¶ 10; Doc. 52-2, ¶ 4.)  Defendant Nickerson is the mayor of Blossburg Borough.  (Doc. 52-2, ¶ 6.)  Defendant Barrett is the Blossburg Borough solicitor.  (Doc. 52-7, p. 4.)[2]

In September 2019, Scott and another officer, Officer Warren, lodged a complaint against Chief McCurdy with the Blossburg Borough Council President and Mayor Nickerson regarding McCurdy's allegedly "unprofessional, unethical, and unacceptable" behavior.  (Doc. 52-36.)  The allegations included failing to properly investigate certain cases, failing to document investigations or log evidence, failure to file charges when Scott and Warren believed charges were necessary, and executing an allegedly illegal search.  (*Id.*)  At some point, Scott contacted the Tioga County District Attorney's Office and the Pennsylvania State

---

[1] The court has gathered these undisputed facts from Defendants' Statement of Material Facts, Doc. 47, Plaintiff's Response, Doc. 52 -1, Plaintiff's Counterstatement of Material and Disputed Facts, Doc. 52-2, and the record as a whole.  Because Defendants' Statement of Material Facts does not provide the whole picture of the record evidence, the court also relied on the citations to the record provided by Plaintiff's counterstatement.  The court will note facts that are disputed. The court construes the facts in the light most favorable to the non-movant, Scott, and draws all reasonable inferences in Scott's favor.  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018).

[2] For ease of reference, the court utilizes the page numbers contained in the CM/ECF header.

Police with these concerns.  (Doc. 47, ¶ 5; Doc. 52-2, ¶ 5.)  After lodging this official complaint with the Borough, Scott also made an official allegation of retaliation against McCurdy with the Borough.  (Doc. 49-7.)  In the retaliation allegation, Scott contends that McCurdy changed the shift schedules after Scott and the other officer made their complaint so that the two would no longer be scheduled together.  (*Id.*)

In October 2020, Scott had a planned vacation with his wife.  (Doc. 47, ¶ 14; Doc. 52-2, ¶11.)  On that vacation, Scott threatened suicide.[3]  (Doc. 47, ¶ 13; Doc. 52-2, ¶ 13.)  Upon returning home from vacation, Scott presented to the emergency room of Guthrie Robert Packer Hospital ("Guthrie") in order to seek mental health treatment.  (Doc. 47, ¶ 13; Doc. 52-2, ¶ 13.)  Scott was not hospitalized overnight and began participating in an outpatient program Monday through Friday from 8:00 a.m. to 12:00 p.m.  (Doc. 47, ¶ 19; Doc. 52-2, ¶ 14.)  From the medical notes taken during the program, it appears that Scott participated in the program from October 14, 2020, until October 30, 2020.  (Doc. 52-9.)[4]

---

[3] There is a factual dispute regarding the exact circumstances of this threat, such as the location of a firearm when Scott made the threats.  (*See* Doc. 47, ¶ 13; Doc. 52-2, ¶ 13.)  The court finds that these disputes are immaterial, and it is not necessary for the court to discuss these discrepancies further.

[4] In the brief in support of their motion for summary judgment, Defendants argue the only medical records in this case are the "return-to-work" notes because "Plaintiff prevented the Defendant from this information . . . ."  (Doc. 48, p. 14.)  However, Scott has provided his treatment records from Robert Packer Hospital, containing a diagnosis and summaries of his outpatient treatment, as an exhibit attached to his brief in opposition.  (Doc. 52-9.)  Additionally, in a footnote, Scott contends that Defendants were "given an executed HIPPA authorization as

Scott initially told his direct superior, McCurdy, that he needed time off for a "family emergency" on October 12, 2020.  (Doc. 47, ¶ 14; Doc. 52-2, ¶ 15.) McCurdy responded that Scott should take time off as needed and then later asked how many days Scott would need.  (Doc. 47, ¶ 15; Doc. 52-2, ¶ 15.)  After a few days, Scott advised McCurdy of some more details regarding his mental health event and that he would be taking time off to get the treatment described above. (Doc. 47, ¶ 25; Doc. 52-2, ¶ 16.)[5]  McCurdy then advised Nickerson that Scott would be taking time off to handle personal issues with his wife and psychiatric treatment.  (Doc. 49-15, p. 27; Doc. 49-14, p. 45.)

At some point during his leave, Scott was instructed to obtain a psychiatric evaluation by McCurdy.  (Doc. 49-14, p. 57.)  After this evaluation was completed, an employee from the hospital called McCurdy and told McCurdy that Scott did not score well on the evaluation, that "he is not fit to come back to work," and that "if he was a cop where she lived, she definitely wouldn't want him on the street."

---

requested, and they produced the personally produced [] inpatient records from Guthrie reflecting his diagnoses, past medical history and treatment."  (Doc. 52, p. 19 n.5.)  In their reply brief, Defendants inexplicably continue to contend that there is no "medical report setting forth a diagnosis for Mr. Scott . . . ."  (Doc. 63, pp. 6, 7.)  It is unclear why Defendants did not address these medical records in their briefing.  However, as Scott is entitled to point to specific evidence to defeat a summary judgment motion and there has not been a request to exclude or strike these documents, the court will consider these records.

[5] According to Exhibit I attached to Scott's brief in opposition, he informed the chief that he went to the ER after a "breakdown" and that he would be attending a day program for at least two weeks.  (Doc. 52-11.)

(Doc. 49-14, pp. 61–62.)  McCurdy then relayed this information to Barrett and Nickerson.  (*Id.* at 62.)  Nickerson then informed the police committee of the Blossburg Borough Council of the details surrounding Scott's suicide attempt and his treatment.[6]  (Doc. 49-15, pp. 44.)  After receiving this information, one of the members of the police committee expressed concern over Scott returning to work due to his medical condition and also referenced his past "insubordination."  (Doc. 52-15, p. 10; Doc. 49-15, p. 45.)

On November 5, 2020, Scott received a note from the hospital that stated he could return to work.  (Doc. 49-2, p. 6.)  This note was then passed on to the police committee, who expressed continued concerns about his fitness to return to work.  (Doc. 49-15, pp. 32, 33.)  The police committee decided to place Scott on administrative leave.  (Doc. 52-15, p. 7; Doc. 52-37, p. 10.)  At this point, Solicitor Barrett advised the police committee to create a list of Scott's past insubordination.  (Doc. 49-15, p. 33.)[7]

---

[6] During the relevant time period, the police committee was comprised of Mayor Nickerson, Borough Council President Jolene Hall, Tim Martin, and Jerome Ogden.  (Doc. 49-15, p 54.) Chief McCurdy and Solicitor Barrett would attend as needed.  (Doc. 49-14, p. 104; Doc. 49-16, p. 8.)  The police committee oversees the police department, but all final hiring and termination decisions must be voted on by the Borough Council.  (Doc. 52-2, ¶ 29.)

[7] These facts contained in the prior two sentences were not presented by Defendants but are presented by Scott and supported by the record, as identified by the citations to depositions of Defendants and police committee members.

On November 25, 2020, Scott, Nickerson, McCurdy, and Barrett met to discuss Scott's employment status.  (Doc. 47, ¶ 22; Doc. 52-2, ¶ 34.)  Defendants claim that this meeting was prompted due to Scott seeking other employment, and they offered him a severance package.  (Doc. 47, ¶ 22.)  On the other hand, Scott contends that after they inquired regarding his mental health, Barrett advised Scott that he would not pass a mental health exam and it was better if he resigned.  Scott also asserts that Nickerson referred to him as a "liability," and then offered him a severance package.  (Doc. 49-13, pp. 62–64.)  On November 30, 2020, Scott informed McCurdy that he would need to think about the severance package, and McCurdy, in turn, informed Scott he was on administrative leave with pay.  (Doc. 52-17.)  Th offered severance package was memorialized in a letter sent by Solicitor Barrett to Scott, dated December 2, 2020, stating that "[t]he topic of this [November 25, 2020] meeting was the Borough questioning your fitness for duty as a Police Officer in Blossburg Borough."  (Doc. 52-16.)  The letter further recounted that "[y]ou acknowledged that you had problems but felt that those problems were taken care of and that you could return to duty.  It was explained to you that the Borough would have to do a fit for service examination to determine if you can return to duty."  (*Id.*)  The severance package memorialized by this letter required Scott to resign as a police officer, and then provided that the Borough

would not object to an unemployment compensation request and the Borough

would provide medical and life insurance for six months after the resignation.  (*Id.*)

Scott chose not to take the severance package and was then directed by

McCurdy that he needed to be evaluated again, but this time by a specific doctor.

(Doc. 49-13, p. 98; Doc. 49-14, pp. 87, 88.)  Scott complied with this request and

received a note from Laurel Health, signed by physician's assistant Jacqueline

Wiand, stating in totality:

> I evaluated Robert Scott today.  Patient is considered stable from a
> psychiatric standpoint at this time.  Robert has no acute risk issues, has
> a safety plan, and informed consent for medication treatment was given.
> He is not currently deemed to be an imminent threat to himself or others
> based on the interview today.  It is recommended that he continue with
> regularly scheduled therapy appointments as well as ongoing
> medication management appointments.  It is also recommended to
> continue to avoid any alcohol consumption as this can greatly
> destabilize his mood.  Please call my office with any further questions
> or concerns.

(Doc. 49-2, p. 5; Doc. 52-19.)  Scott notified Nickerson of this medical clearance

and also emailed the Borough Secretary, asking that she bring it to the attention of

the Borough Council, Chief McCurdy, and Borough Manager George Lloyd.

(Doc. 52-21.)  There was no response to this email.

Scott had a follow up appointment with PA Wiand, and she authored an

identical note on February 3, 2021.  (Doc. 49-2, p. 4; Doc. 52-22.)  Scott again

emailed this note to the Borough Secretary and Chief McCurdy, and again received

no reply.  (Doc. 52-23.)  Scott received another identical note from PA Wiand on

February 26, 2021, which he forwarded to the Borough with no response.  (Doc

49-2, p. 2; Doc. 52-26.)  Scott additionally received a note from his family nurse

practitioner, stating that he was "able to return to work without restriction.  Is able

to return to full duty."  (Doc. 49-2, p. 3; Doc. 52-27.)

On March 26, 2021, Scott received an additional identical note from PA

Wiand, but with the addition that the recipient of the note should "inform this

provider if there is any further documentation needed to support [Scott's] return to

work."  (Doc. 52-31.)  Scott again emailed this note to the Borough Secretary and

McCurdy.  (*Id.*)  No one at the Borough advised Scott that any further

documentation was necessary.  (Doc. 49-13, p. 183.)  However, at least Barrett and

McCurdy were concerned that the return-to-work notes did not reference his

occupation as a police officer and only cleared him to work "generally."  (Docs.

49-9, 49-10.)  This concern was never expressed to Scott.  (Doc. 49-13, p. 183.)

On April 14, 2021, Solicitor Barrett and Chief McCurdy held a *Loudermill*

hearing with Scott, wherein they asked him about specific instances of alleged

insubordination in 2019.  (Doc. 49-6.)  Thereafter, on April 21, 2021, Barrett

drafted a "Statement of Charges," which McCurdy signed, and then presented to

Scott.  (Doc. 52-32; Doc. 49-14, p. 41.)  These charges recount the following

instances of alleged insubordination in 2019: (1) Scott entered McCurdy's office

without permission; (2) Scott removed tint from a police vehicle's windows

without permission; (3) Scott failed to attend one court hearing and did not notify the court or McCurdy; and (4) Scott opened McCurdy's pay stub while McCurdy was taking time off.  (Doc. 52-32.)  It was alleged that in 2020: (1) Scott removed a police car from McCurdy's residence while McCurdy was on vacation and relocated it to the police parking lot; (2) Scott put a notice in McCurdy's mailbox that a crash report was due in fifteen days; (3) Scott fought with McCurdy regarding a spare body camera and cursed at McCurdy in front of another officer. (*Id.*)  And it was alleged that in 2021, while Scott was on administrative leave, he attempted to change the password to the Police Department email.[8]  (*Id.*)  The letter also references four other "violations:" (1) Scott "consistently refused to answer [his] cell phone while off duty[,]"; (2) Scott failed to reside within the Borough of Blossburg within five years of his hire; (3) Scott threatened suicide with a firearm in front of his wife on October 11, 2020; and (4) in March 2021, Scott "indicated to the Chief" that he was consuming alcohol, which was contrary to the medical advice provided by his doctor.  (*Id.*)

After receiving the Statement of Charges, Scott requested a hearing with the whole Borough Council, which occurred on April 29, 2021.  (Doc. 49-4.)  The hearing was conducted by hearing officer David Brann, Esquire.  (Doc. 49-4, p. 6.)

---

[8] This list of actions between 2019 and 2021 will be referred to as "insubordinate actions" by the court.  This is the way the parties identify this list of allegations; however, the court does not ascribe any legal weight to the description of the actions as "insubordinate."

Solicitor Barrett represented the Borough administrator, acting similarly to a prosecutor.  (*Id.* at 9.)  Scott represented himself. (*Id.* at 13.)  The witnesses at the hearing included Scott, McCurdy, Nickerson, and former Officer Ron Warren.  (*Id.* at 3–4.)  At the hearing, Scott was questioned about each instance of insubordination described in the letter.  (*Id.* at 18–40.)  Overall, he stated that he did the actions, but also explained his reasons for believing he was justified in taking those actions.  (*Id.*)  McCurdy testified and detailed the insubordinate actions contained in the charge letter and was cross-examined by Scott.  (*Id.* at 41–141.)  Nickerson also testified and was cross-examined at the hearing, relaying his account of Scott's employment at the Borough.  (*Id.* at 144–81.)

It is important to note that both McCurdy and Nickerson testified during the hearing that Scott had requested time off for mental health purposes, and then someone from the hospital told McCurdy that Scott did not score well on a psychiatric exam and that Scott was a risk.  (*Id.* at 72, 150.)  McCurdy detailed Scott's suicide attempt as relayed to him by the hospital employee.  (*Id.* at 76.)  Both Nickerson and McCurdy recommended termination.  (Doc. 49-4, p. 161; Doc. 49-5, ¶ 13.)  Nickerson specifically recommended termination because Scott did not follow through on treatment, engaged in insubordinate conduct, and was drinking alcohol against medical advice.  (Doc. 49-4, p. 162.)

After the hearing, the Borough Council drafted findings that Scott had committed the insubordinate actions detailed in the Statement of Charges. (Doc. 49-5, ¶ 2.)  The Borough Council found that this conduct was unbecoming of an officer.  (*Id.* ¶ 3.)  The Borough Council further found that Scott "failed to comply with the recommendation of his medical providers that he abstain from the use of alcoholic beverages."  (*Id.* ¶ 4.)  The Council found that Scott should be terminated from his employment.  (*Id.* ¶ 5.)  These findings of fact were adopted by the Council on June 9, 2021, and Scott's employment with Blossburg Borough officially ended on that date.  (Doc. 49-17.)

Scott filed the instant lawsuit on November 22, 2021, alleging violations of the Americans with Disabilities Act ("ADA"), the Pennsylvania Human Relations Act ("PHRA"), the Family and Medial Leave Act ("FMLA"), First Amendment retaliation pursuant to 42 U.S.C. § 1983, and violations of the Pennsylvania Whistleblower Law ("PWL").  (Doc. 1.)  On January 13, 2022, Defendants filed a motion to dismiss for failure to state a claim.  (Doc. 11.)  After full briefing, the court granted the motion to dismiss in part, dismissing the First Amendment claim without prejudice and the punitive damages claim under the PHRA against Blossburg Borough with prejudice.  (Doc. 32.)  The motion was denied in all other respects.  (*Id.*)  Scott filed an amended complaint on December 1, 2022, bringing the same claims as the original complaint.  (Doc. 35.)

Defendants filed the instant motion on April 28, 2023.  (Doc. 46.)  Scott filed his brief in opposition on April 19, 2023.  (Doc. 52.)  Thereafter, on May 30, 2023, Defendants filed a motion to deem facts admitted and a motion in limine regarding the "cat's paw" theory of liability.  (Docs. 57, 58.)  After letters from counsel, the court stayed all further case management deadlines, including the briefing on the motion in limine.  (Doc. 62.)  The parties then finished briefing the summary judgment motion and the motion to deem facts admitted.  Both motions are now ripe for disposition.

### Jurisdiction and Venue

This court has jurisdiction under 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States.  This court also has supplemental jurisdiction over the state law statutory claims under 28 U.S.C. § 1367 because they are related to the federal claims.  Venue is appropriate under 28 U.S.C. § 1931 because all actions or omissions occurred within the Middle District of Pennsylvania.

### Standard of Review

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is material if resolution of

the dispute "might affect the outcome of the suit under the governing law."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is
not precluded by "[f]actual disputes that are irrelevant or unnecessary."  *Id.*  "A
dispute is genuine if a reasonable trier-of-fact could find in favor of the
nonmovant' and 'material if it could affect the outcome of the case."  *Thomas v.
Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh
Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts
in the light most favorable to the non-moving party and draw all reasonable
inferences in that party's favor.  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288
(3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher
Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  The court may not "weigh the evidence"
or "determine the truth of the matter."  *Anderson*, 477 U.S. at 249.  Instead, the
court's role in reviewing the facts of the case is "to determine whether there is a
genuine issue for trial."  *Id.*

The party moving for summary judgment "bears the initial responsibility of
informing the district court of the basis for its motion, and identifying those
portions of 'the pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any,' which it believes demonstrate the
absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The non-moving party must then

oppose the motion, and in doing so "'may not rest upon the mere allegations or

denials of [its] pleadings' but, instead, 'must set forth specific facts showing that

there is a genuine issue for trial.  Bare assertions, conclusory allegations, or

suspicions will not suffice.'"  *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent.

Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to

make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial."

*Celotex*, 477 U.S. at 322.  "The mere existence of a scintilla of evidence in support

of the plaintiff's position will be insufficient; there must be evidence on which the

jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  "Where

the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co.,

Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

At the outset, the court must address the motion to deem facts admitted.  In

their motion, Defendants ask the court to deem their statement of facts admitted

because Scott's response is "replete with argument and personal commentary and

has failed to properly controvert or cite any record evidence to material facts"

contrary to Local Rule 56.1.  (Doc. 57.)  Scott responds that Defendants' statement

is argumentative and conclusory and that he has sufficiently complied with the

Local Rules.  (Doc. 64.)

>     Middle District of Pennsylvania Local Rule 56.1 provides:
>
>     The papers opposing a motion for summary judgment shall include a
>     separate, short and concise statement of the material facts, responding
>     to the numbered paragraphs set forth in the statement required in the
>     foregoing paragraph, as to which it is contended that there exists a
>     genuine issue to be tried.
>
>     Statements of material facts in support of, or in opposition to, a motion
>     shall include references to the parts of the record that support the
>     statements.
>
>     All material facts set forth in the statement required to be served by the
>     moving party will be deemed to be admitted unless controverted by the
>     statement required to be served by the opposing party.

Local Rule 56.1.  A district court is not bound to follow the local rules of its

district in every case.  Rather, the court "can depart from the strictures of its own

local procedural rules where (1) it has a sound rationale for doing so, and (2) so

doing does not unfairly prejudice a party who has relied on the local rule to his

detriment."  *Advanced Fluid Sys., Inc. v. Huber*, 958 F.3d 168, 181 (3d Cir. 2020)

(quoting *United States v. Eleven Vehicles, Their Equipment & Accessories*, 200

F.3d 203, 215 (3d Cir. 2000)).  Further, the purpose of Local Rule 56.1 is "to

facilitate the court's understanding of the facts by indicating which facts are

undisputed, and to provide specific evidence supporting each party's position as to

the facts that remain in dispute." *Id.* (citing *Landmesser v. Hazleton Area Sch. Dist.*, 982 F. Supp. 2d 408, 412 (M.D. Pa. 2013)).

Here, the court finds that Scott's response, Doc. 52-1, is not so deficient that the court is unable to understand which facts are in dispute. At times, Scott's response cites to his own counterstatement of disputed facts, Doc. 52-2. This citation method is not in compliance with the Local Rule, which requires the filing of one responsive document. But, together, these documents achieve the purpose of Local Rule 56.1. Looking at both documents together, the only instances in which Scott does not cite to the record are when he is refuting certain factual statements as legal conclusions or asserting that the citation offered by Defendants' does not support their assertion. These un-cited statements do not hinder the court from determining which facts are undisputed. Moreover, the court notes that Defendants did not move to strike Scott's counterstatement, nor do they address that document at all. To the extent that Scott's counterstatement provided facts in addition to those provided by Defendants, the court cited to the record, not the characterizations by counsel in the statement. Thus, the court has independently reviewed the facts to determine whether there are any genuine issues for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

Accordingly, because the court has a sound basis for departing from the Local Rule in this instance and Defendants are not prejudiced by that departure, the motion to deem facts admitted is denied.  The court now turns to the merits of the motion for summary judgment.

### A. Americans with Disabilities Act

#### 1. Discrimination

In support of their motion for summary judgment on the ADA claim, Defendants argue they are entitled to judgment as a matter of law because Scott cannot establish that he is disabled under the ADA.  (Doc. 48, p. 5.)  Defendants generally argue that no one on the Borough Council terminated his employment with the Borough because of his mental health status.  (*Id.* at 5–9.)  Defendants' overarching argument on this issue is that McCurdy, Nickerson, and Barrett were not final decisionmakers on Scott's employment, making their statements about his mental health irrelevant.  Defendants contends that Scott's termination was triggered by him seeking outside employment, and the Borough Council's final decision to terminate Scott's employment was based on his insubordinate conduct, not his mental health issue.  (*Id.* at 5–12.)

Scott replies that Defendants are not entitled to judgment as a matter of law because he has provided evidence to support an ADA claim under either a direct evidence of discrimination framework or a circumstantial evidence burden shifting

framework.  (Doc. 52, pp. 9–34.)  To support his direct evidence argument, Scott points to various quotations from Nickerson and police committee members stating that they believed Scott was not fit to return to work after his suicide threat.  (*Id.* at 12–13.)  Scott also argues he has established that he has a disability under any definition provided by the ADA.  (*Id.* at 14–29.)  Scott then argues that a reasonable jury could find his termination pretextual.  (*Id.* at 29–32.)

The first step in the analysis of an ADA claim, under either a direct evidence or circumstantial evidence theory, is that a plaintiff must demonstrate that he has a disability within the meaning of the statute.  42 U.S.C. § 12112(a).  42 U.S.C. § 12102(1) provides that "[t]he term 'disability' means, with respect to an individual – (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))."  42 U.S.C. § 12102(1).  The statute itself provides further guidance on construing these sections, specifically, that

> (A) The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter. . . .
>
> (C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.
>
> (D) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

42 U.S.C. § 12102 (4) (A), (C), (D).  Scott advances arguments as to all three

disability definitions, but Defendants only argue under subsection (A) and (C).  For

completeness, the court will address all three definitions.

Turning first to whether Scott has a "physical or mental impairment that

substantially limits one or more major life activities[,]" the Equal Employment

Opportunity Commission ("EEOC") guidelines provide that a physical or mental

impairment includes "any mental or psychological disorder, such as an intellectual

disability . . . organic brain syndrome, emotional or mental illness, and specific

learning disabilities."  29 C.F.R. § 1630.2(h).  Further:

> An impairment is a disability within the meaning of this section if it
> substantially limits the ability of an individual to perform a major life
> activity as compared to most people in the general population.  An
> impairment need not prevent, or significantly or severely restrict, the
> individual from performing a major life activity in order to be
> considered substantially limiting.  Nonetheless, not every impairment
> will constitute a disability within the meaning of this section.

*Id.* § 16320.2(j)(ii).  Further, courts should consider:

> as compared to most people in the general population, the condition
> under which the individual performs the major life activity; the manner
> in which the individual performs the major life activity; and/or the
> duration of time it takes the individual to perform the major life activity,
> or for which the individual can perform the major life activity.

29 C.F.R. § 1630.2(4)(i).  Major life activities as defined by the statute, include

"but are not limited to, caring for oneself, performing manual tasks, seeing,

hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing,

learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102 (2)(A).

Here, there is no evidence that Scott's depression and anxiety substantially impaired any major life activity. The evidence reflects that, when his disability was active, Scott never stayed overnight at the hospital and participated in partial in-patient treatment for around two weeks. (Doc. 52-9.) Thereafter, there is only evidence supporting the recommendation that he continue with medication treatment and therapy. (Doc. 49-2.) He was then cleared to return to work. (*Id.*) Although he was prevented from working for the two weeks while he participated in the treatment program, a two-week leave of absence is not a substantial limitation compared to the average person. Medication management and continued therapy, absent further evidence, are also not substantially limiting compared to the average person who takes medication and regularly needs to see their physician. Accordingly, Scott has not produced sufficient evidence to create a genuine issue of material fact as to whether he is actually disabled under the statute.

Turning to the "record of such an impairment" definition, such a claim requires a plaintiff to "prove that she [or he] had a 'history of, or [had] been misclassified as having, an impairment that substantially limited a major life activity.'" *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 437 (3d Cir. 2009) (quoting *Sorensen v. Univ of Utah Hosp.*, 194 F.3d 1084, 1087 (10th Cir. 1999)). There

20

must also be evidence that the employer "relied upon [the] record of impairment in making its employment decision."  *Id.*  Additionally, "a relatively short-term absence from work, without any long-term impairment, is generally held to be insufficient to create a record of disability."  *Id.*

Here, there is no evidence of record that Scott had a record of anxiety and depression that substantially limited a major life activity.  While his medical records state that he has a history of generalized anxiety disorder and he tried antidepressants, he also testified that he had not had any previous treatment for mental health-related issues.  (Compare Doc. 52-9, p. 9 and Doc. 52-4, p. 8.)  This is insufficient to show that he was substantially limited in performing any major life activity.  Moreover, there is no evidence that his employer had any knowledge of past mental health treatment.  Accordingly, Scott has not produced sufficient evidence to create a genuine issue of material fact as to whether he is disabled under a "record of" definition.

Turning last to the "regarded as" definition, according to the statute:

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102(3)(A).  There is an exception, however, to this definition such that it "shall not apply to impairments that are transitory and minor.  A transitory

impairment is in an impairment with an actual or expected duration of 6 months or less." *Id.* § 12102(3)(B). The statute itself is silent as to the meaning of minor, but "the ADA regulations clearly state that an employer must establish that the perceived impairment is objectively *both* transitory and minor." *Eshleman v. Patrick Indus., Inc.*, 961 F.3d 242, 247 (3d Cir. 2020). This exception is "intended to weed out only 'claims at the lowest end of the spectrum of severity,' such as 'common ailments like the cold or flu,' and that the exception 'should be construed narrowly.'" *Id.* at 248 (citing H.R. Rep. No. 110–730 pt. 2, at 5 (2008)). The impairment must be objectively transitory and minor. *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014). In reaching this decision, a court should consider facts such as "the symptoms and severity of the impairment, the type of treatment required, the risk involved, and whether any kind of surgical intervention is anticipated or necessary–as well as the nature and scope of post-operative care." *Eshleman*, 961 F.3d at 249. Additionally, "[a]n employer regards a person as disabled when it 'misinterpret[s] information about an employee's limitations to conclude that the employee is incapable of performing' his or her job requirements.'" *Id.* at 245. Although often referred to as an affirmative defense, a plaintiff producing evidence of only a transitory and minor impairment has failed to meet the statutory definition of being "regarded as" disabled. *Id.* at 246 fn.25.

Defendants argue that Scott has only produced evidence of a transitory and minor impairment because there is no medical evidence in the record and the return-to-work slips provided show that his impairment was only transitory and minor. (Doc. 48, pp. 14, 15.) Scott contends that his medical records show he suffered from "generalized anxiety disorder" and "situational depression," and that prior cases holding a plaintiff only had a transitory and minor impairment did so with an impairment such as "broken limbs, sprained joints, concussions, appendicitis, and influenza[.]" (Doc. 52, pp. 20, 21.)

The court agrees with Scott that his impairment is not objectively transitory and minor. While his patrial inpatient stay may have only been for two weeks, there is sufficient evidence in the record from Scott's medical diagnosis of generalized anxiety disorder and the return-to-work slips advising he continue with medication and therapy for an indefinite length of time that a reasonable jury could decide that his impairment was not transitory, that is, lasting for less than six months. As an employer is required to establish that the condition was both minor and transitory, this is sufficient to defeat the exception. Nonetheless, given that cases and EEOC guidance suggest that a "minor" impairment is something like the flue or a broken limb, a reasonable jury could decide that generalized anxiety and depression, which at one point escalated to a suicide threat and partial inpatient treatment, is not a minor impairment.

Therefore, there is a disputed fact regarding whether Scott's impairment was transitory and minor.  Thus, the court will now determine whether Scott has produced sufficient evidence that a reasonable jury could conclude that his employer regarded him as having such an impairment.

The parties dispute the showing required to establish a "regarded as" disability.  Defendants argue that Scott must provide evidence that his employer regarded him as disabled under the ADA, specifically, that they regarded him as having an impairment that substantially limited a major life activity because there is no evidence that the Borough Council viewed him as having a substantially limiting disability.  (Doc. 48, pp. 8–9.)  Scott contends that he must only show that his employer was aware of his impairment and nothing more.  (Doc. 52, pp. 18, 19.)

The parties' confusion stems from the pre- and post-amendment versions of the ADA.  Congress amended the ADA in 2008, and specifically changed the definition of a "regarded as" disability.  Pre-2008 amendments required that a plaintiff show that the employer regarded the employee as having a disability that substantially limited the plaintiff's major life activities.  *See Williams v. Phila. Hous. Auth. Police Dept.*, 380 F.3d 751, 767 (3d Cir. 2004).  However, the text of the statute now specifically rejects this definition, providing that an individual is regarded as having such an impairment, "if the individual establishes that he or she

24

has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*." 42 U.S.C. § 12102 (3)(A) (emphasis added).

Accordingly, under the post-2008 amendment version of the ADA, it is not necessary for a plaintiff to show that their employer viewed them as having an impairment that substantially limited a major life activity, as contended by Defendants. *See Jakomas v. City of Pittsburgh*, 342 F. Supp. 3d 632, 647–48 (W.D. Pa. 2018). However, the burden is not as minimal as Scott contends—that a plaintiff need only show that the employer knew of his impairment. In fact, a plaintiff can proceed under a regarded as definition of disability if he can show that the employer knew of the impairment and then took some adverse employment action because of it. *See Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 692–93. (W.D. Pa. 2014.)

This dispute is the crux of this case–whether Scott's mental health incident was the reason the Borough terminated his employment. Defendants consistently argue that Scott was terminated because of his past insubordination, as evidenced by the findings of fact made by the whole Borough Council, which only reference his mental health incident and, on their face, do not identify this incident as the reason for the termination. (Doc. 48, pp. 10–12; Doc. 49-4, p. 5.) On the other

hand, Scott contends that multiple important people in the process leading up to his final hearing with the Borough Council made statements showing that his suicide threat was the main consideration in preventing him from returning to work and starting the process which led to his termination.  (Doc. 52, pp. 12–14.)

The court holds that Scott has produced sufficient evidence to enable a reasonable jury to conclude that the Borough terminated his employment because of his mental health incident.  While Nickerson, McCurdy, and Barrett were not the people with the final authority to terminate Scott's employment, they were key players in the broader decision-making process, and their actions were motivated, in large part, by Scott's mental health incident.  Further, although Defendants claim that the Borough heard nothing about Scott's mental health, both Nickerson and McCurdy detailed his suicide threat, as relayed to them by Guthrie hospital, and the hospital employee's opinion that Scott should not return to work.  There are also statements from police committee members, who made the decision to allow the Borough Council to vote on the termination of Scott's employment, that showed those members were motivated, in part, by Scott's mental health status. This is sufficient for a reasonable jury to conclude that the adverse action was caused by Scott's mental impairment.

In fact, the issue of causation is a disputed material fact that runs through every element of showing a violation of the ADA, under any theory presented by

the parties.  For example, to prove a prima facie case of discrimination, a plaintiff must show "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination."[9] *Gaul v. Lucent Technologies, Inc.,* 134 F.3d 576, 580 (3d Cir.1998).  As to the third prong, Defendants contend that any employment decision by the Borough Council was not a result of discrimination because the members of the Council at large did not know of Scott's mental health status and only heard about his insubordination, and the individuals that did have information about his mental health status had no participation in that decision.  (Doc. 63, pp. 3–8.)  Defendants question the sufficiency of the evidence provided by Scott regarding the position of certain individuals who made comments regarding his mental health and his employment, and also the sufficiency of his return-to-work notes.  (*Id.*)  Scott points to the statements made by main actors, such as the mayor, the police chief, and police committee members, to Scott himself, to the police committee, and to the Borough Council which show a connection between his mental health incident and members

---

[9] Nowhere in their briefing do Defendants dispute that Scott was a qualified individual.  Further, there is evidence in the record that Scott was a full-time police officer with Blossburg Borough since 2012.  (Doc. 52-4, p. 7.)  This is a sufficient showing that he was otherwise qualified to perform the essentials function of the job.

viewing him as unfit for police service.  (Doc. 52, pp. 12–14.)  These are material

disputes of fact that must be left to a jury to resolve.

The next two pieces of the *McDonnel/Douglas* framework–the employer

showing a legitimate reason for taking the adverse employment action and the

plaintiff showing that this reason is pretextual–once again revolve around this same

factual dispute.  Defendants contend that their legitimate reason for terminating

Scott's employment was the insubordinate conduct, which the Borough Council

then adopted and based the termination on.[10]  (Doc. 48, pp. 10–12; 18, 19.)  Scott

then contends that this explanation is merely pretextual because each instance of

insubordination was over two years old at the time when he received the charges

and no action was taken at the time of the alleged insubordination.[11]  (Doc. 52, pp.

29–34.)  For the reasons explained above regarding causation, there is a disputed

issue of material fact here that a jury must decide.  Additionally, were Scott to

proceed under a direct evidence of discrimination framework, the disputed issue

---

[10] "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

[11] "[T]o defeat summary judgment when the defendant answers the plaintiff's prima face case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe than an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764.

around causation would remain.[12]  Accordingly, Defendants' motion for summary judgment is denied on the ADA discrimination claim.

### 2.  Retaliation

42 U.S.C. § 12203(a) provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter . . . ."  Thus, in order to succeed on an ADA retaliation claim, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."  *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004) (abrogated on other grounds) (citing *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567–68 (3d Cir. 2002)).  While still rather amorphous in the Third Circuit, a plaintiff can establish a causal connection by showing "[t]emporal proximity between protected activity and adverse employment action and/or evidence of ongoing antagonism*."  Drwal v. Borough of W. View, Pa.*, 617 F. Supp. 2d 397, 422 (W.D. Pa. 2009) (citing *Abramson v.*

---

[12] To proceed under a direct evidence framework, the plaintiff must come forward with evidence "demonstrat[ing] that the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision."  *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 512–13. This evidence "must be connected to the adverse employment action, and it must 'be strong enough to permit the factfinder to infer that a discriminatory attitude was more likely than not a motivating factor in the [employer's] decision.'"  *Jacobs v. York Union Rescue Mission, Inc.*, No. 1:12-CV-0288, 2014 WL 6982618, at *11 (M.D. Pa. Dec. 10, 2014) (citing *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010)).

*William Patterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001)).  Temporal

proximity alone is sufficient if it is unusually suggestive; otherwise, there must be

other evidence of retaliatory motive.  *Williams*, 380 F.3d at 760.  However, "[i]t is

important to emphasize that it is causation, not temporal proximity itself, that is an

element of plaintiff's prima facie case, and temporal proximity merely provides an

evidentiary basis from which an inference can be drawn." *Kachmar v. SunGuard*

*Data Systems, Inc.,* 109 F.3d 173, 178 (3d Cir. 1997).

Defendants concede that "alerting his employer" to his mental health

treatment is a protected activity, and terminating his employment was an adverse

action.  (Doc. 48, pp. 25.)  For purposes of the ADA claim, Scott contends he was

retaliated against for requesting the initial medical leave and for filing an official

charge of discrimination against Blossburg Borough on January 26, 2021.   (Doc.

52, p. 34.)[13]  Accordingly, the only element at issue here is the causal connection

between the protected activity and the adverse action.

Defendants argue that there is not sufficient evidence of a causal connection

between Scott's leave request and the termination of his employment because they

were separate by approximately six months, there is no evidence of ongoing

antagonism, and his employment was terminated solely based on his

---

[13] Scott also argues he was retaliated against for requesting FMLA leave.  (Doc. 52, p. 34.)  This
contention will be addressed in the section regarding the FMLA.

insubordination.  (Doc. 48, pp. 25–30.)  Scott argues that the whole record could

support a finding of retaliation against Scott.  (Doc. 52, p. 39.)

Here, for the same reasons as discussed above, there is sufficient evidence for a

reasonable jury to find that, but for Scott alerting his employer that he was seeking

mental health treatment, the Borough would not have taken the subsequent actions

against him.  While there may not be unusually suggestive temporal proximity or

evidence of ongoing antagonism, there is sufficient evidence for a jury to infer

causation.  Accordingly, Defendants' motion for summary judgment is denied on

the ADA retaliation claim.

### B. PHRA

Both parties contend that the analyses of an ADA claim and a PHRA claim

are the same.  (Doc. 48, p. 16; Doc. 52, p. 9.)  However, they both cite case law

prior to the 2008 amendments of the ADA, which changed the definition of being

"regarded as" disabled.  Since Congress amended the ADA, the Pennsylvania

General Assembly has not amended the PHRA.  *Jacobs v. York Union Rescue*

*Mission, Inc.*, 2014 WL 6982618 at *14 (M.D. Pa. Dec. 10, 2014); *see also*

*Rubano v. Farrell Sch. Dist.*, 991 F. Supp. 2d 678, 693 (W.D. Pa. 2014).

Accordingly, under the PHRA, a plaintiff must establish that they are disabled

under the pre-2008 amended ADA.  *Id.*  Since neither party has appropriately

briefed this issue, whether Scott may proceed with his PHRA claim remains open and must be resolved prior to trial.

## C. FMLA

Defendants argue that Scott has failed to produce evidence of an FMLA interference claim because there is no evidence that "the Borough was ever provided notice by Mr. Scott of his need to take leave." (Doc. 48, pp. 32, 33.) Scott only makes arguments regarding FMLA retaliation. (Doc. 52, pp. 36, 37.) Neither of these theories is availing. Turning first to a FMLA interference claim, a plaintiff must show:

> (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.

*Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014) (quoting *Johnson v. Cnty. Coll. of Allegheny Cnty.*, 566 F. Supp. 2d 405, 446 (W.D. Pa. 2008). Here, even assuming that Scott was eligible under the FMLA and that he gave sufficient notice, there is no evidence that Scott was denied this leave. The parties do not dispute that Scott's request to take time off to participate in the partial in-patient hospitalization program was granted. (Doc. 47, ¶ 14; Doc. 52-1, ¶ 14.) This is the only evidence of any request for medical leave. Accordingly, there is no genuine

dispute of material fact regarding a FMLA interference claim, and Defendants are entitled to judgment as a matter of law.

Turning to the FMLA retaliation claim, "[t]o succeed on an FMLA retaliation claim, a plaintiff must show that '(1) [ ]he invoked h[is] right to FMLA-qualifying leave, (2) [ ]he suffered an adverse employment decision, and (3) the adverse action was causally related to h[is] invocation of rights." *Ross*, 755 F.3d at 193 (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Center*, 691 F.3d 294, 302 (3d Cir. 2012).   Even Assuming that Scott properly invoked his right to FMLA qualifying leave, there is no evidence demonstrating a causal connection between his request for leave and the termination of his employment.   The evidence in the record shows disputed facts regarding whether Scott's employment was terminated due to his mental health treatment, not due to any request for leave.   In fact, his first request for leave was granted and treated favorably by the Borough.   (Doc. 47, ¶ 26.)   The adverse employment action is potentially connected to Scott's ongoing mental health condition and treatment, not his request to take time off.   Accordingly, there is no genuine dispute of material fact regarding the FMLA retaliation claim, and Defendants are entitled to judgment as a matter of law on the FMLA claim.

**D. First Amendment**

In order for a public employee, such as Scott, to establish a claim of First Amendment retaliation by their employer, the plaintiff "must show that [their] speech is protected by the First Amendment and that the speech was a substantial or motivating factor in what is alleged to be the employer's retaliatory action." *Flora v. Cnty. of Luzerne*, 776 F.3d 169, 174 (3d Cir. 2015). The burden then shifts to the employer "to show that it would have taken the same action even if the speech had not occurred." *Id.*

For a public employee's speech to be protected, he must meet three criteria: 1) he spoke as a citizen, "2) the statement involved a matter of public concern, and 3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement [the employee] made." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241–42 (3d Cir. 2006) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. Thus, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240

(2014).  Moreover, "[a]n employee does not speak as a citizen if the mode and manner of his speech were possible only as an ordinary corollary to his position as a government employee[.]"  *De Ritis v. McGarrigle*, 861 F.3d 444, 454 (3d Cir. 2017).

Here, Defendants argue that Scott was not speaking as a private citizen because every part of his speech was within the scope of his job duties.  (Doc. 48, p. 37.)  Scott does not address whether he was speaking as a citizen or pursuant to his employment duties when he made allegations regarding Chief McCurdy's job performance to the Borough Council.  However, addressing the Borough Council regarding issues with the police department is acting like a citizen.  *Kline v. Valentic*, 283 Fed. App'x 913, 916 (3d Cir. 2008) ("To be sure, as a general matter, police misconduct constitutes a matter of public concern.").  While Scott's complaint addresses issues he observed with his superior in the context of his employment, these concerns were raised to the Borough Council as a whole, which could support the conclusion he was speaking as a citizen.  Thus, drawing all reasonable inferences in favor of the non-movant, there is a genuine issue of fact as to whether Scott spoke as a citizen.

Moving next to whether the statement involved a matter of public concern, as noted above, "police misconduct constitutes a matter of public concern."  *Id.* The issues brought up in Scott and Warren's complaint to the Borough Council

regard McCurdy inappropriately searching a residence and McCurdy's handling of investigations and evidence.  A reasonable jury could infer that these allegations of wrongdoing were a matter of public concern.  Defendants offer no argument regarding whether the Borough had a justification for treating Scott differently than the rest of the public after making these statements.  Accordingly, a reasonable jury could find that Scott's complaint to the Borough Council regarding McCurdy's performance as police chief was protected speech.

The final element of a First Amendment retaliation claims is whether "the speech was a substantial or motivating factor in what is alleged to be the employer's retaliatory action." *Flora*, 776 F.3d at 174.  Scott points to McCurdy's testimony at the public hearing before the whole Borough Council in which McCurdy referenced the complaints attacking his performance as the reason for why the termination hearing was occurring.  (Doc. 49-14, pp. 67–69.)  Defendants only argue that there is no causal connection, without providing any further elaboration or evidence to support this conclusion.  (Doc. 48, p. 37.)  Based on the statements by McCurdy at the termination hearing, there is a dispute of material fact such that a reasonable jury could find that the speech was a substantial or motivating factor in the decision to terminate Scott's employment.

The burden now shifts to Defendants to show they would have taken the same action if the speech had not occurred.  *Flora*, 776 F.3d at 174.  As discussed,

Defendants only provide argument that Scott was not speaking as a citizen when he made these complaints.  As such, Defendants have not supported their burden, and their motion for summary judgment will be denied on the First Amendment retaliation claim.

The court will now turn to the issue of punitive damages, as punitive damages are only available, in this case, under the § 1983 First Amendment retaliation claim.[14]  Defendants argue that summary judgment is warranted because there is no evidence in the record of "conduct that is constitutionally reprehensible to support a claim of punitive damages against the named defendants."  (Doc. 48, p. 45.)  Scott responds that he has "offered evidence that the Mayor, Chief and Solicitor all in concert engaged in deliberate conduct to retaliate against Mr. Scott for previously bringing an internal complaint of illegalities against the chief to Council and external authorities."  (Doc. 52, p. 47.)

In a § 1983 claim, a request for punitive damages may proceed to a jury "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Brennan v. Norton*, 350 F.3d 399, 438 (3d Cir. 2003) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).  This remedy "must be reserved . . . for cases in

---

[14] Punitive damages are not available under the ADA.  *Doe v. Centre Cnty, Pa.*, 242 F.3d 437, 457–58 (3d Cir. 2001.)

which the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief." *Keenan v. City of Phila.*, 983 F.2d 459, 470 (3d Cir. 1992).

Here, there is sufficient evidence to show that McCurdy, at least, acted with the requisite state of mind when he testified at the public hearing that Scott's attempts to expose issues in the police department were insubordination that was not going stop, among other matters.  (Doc. 49-4, pp. 68-70.)  Further, given that Scott often went to Nickerson with his concerns regarding McCurdy's running of the police department, and the multiple conferences between all Defendants, a reasonable jury could find the requisite state of mind.  Overall, this issue is better left for a jury to decide whether the Defendants acted with the requisite state of mind.  *Malone v. Economy Borough Mun. Auth.*, 669 F. Supp. 2d 582, 612 (W.D. Pa. 2009).  Accordingly, the issue of punitive damages may proceed to the jury.

### E. Whistleblower

The Pennsylvania Whistleblower Law ("PWL") provides that:

> No employer may . . . retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee . . . makes a good faith report . . . verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act.

43 P.S. § 1423(a).  The statute further defines wrongdoing as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or

regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." *Id.* § 1422. It also defines waste as "[a]n employer's conduct or omission which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." *Id.*

Moreover, in order to establish a violation of the Whistleblower law for retaliatory termination, a plaintiff must "show, by a preponderance of the evidence, that, prior to the alleged acts of retaliation, he had made a good faith report of wrongdoing to appropriate authorities." *O'Rourke v. Commonwealth*, 778 A.2d 1194, 1200 (Pa 2001); 43 P.S. § 1424(c). To meet this burden, "a plaintiff must 'show by concrete facts or surrounding circumstances that the report [of wrongdoing or waste] led to [the plaintiff's] dismissal, such as that there was specific direction or information received not to file the report or [that] there would be adverse consequences because the report was filed.'" *Golaschevsky v. Com., Dep't of Env't Prot.*, 720 A.2d 757, 759 (Pa. 1998) (quoting *Gray v. Hafer*, 651 A.2d 221, 225 (Pa. Commw. Ct. 1994)). Then, the employer has the opportunity to raise a defense by "prov[ing] by a preponderance of the evidence that the action by the employer occurred for separate and legitimate reasons, which are not merely pretextual." 43 P.S. § 1424(c).

Defendants argue that Scott's "whistleblower" complaint in 2019 is so far removed temporally that it cannot be causally linked to the termination of his employment in 2021.  (Doc. 48, p. 39.)  They also argue that there is no causal connection to the termination of Scott's employment because the complaints were meritless and never investigated.  (*Id.* at 40.)  Scott argues that the "whistleblower" complaint and the termination of his employment are causally connected because they were raised at the *Loudermill* and Borough Council hearings in 2021.  (Doc. 52, p. 42.)

The parties offer no discussion on whether the "whistleblower" complaint is the type of report of wrongdoing or waste covered by the statute.  This is fatal to Scott's Whistleblower claim because the type of report covered by the statute must be a report of actual wrongdoing.  "The test is objective, not subjective; that is, it does not matter whether the plaintiff holds a belief, even if well-founded, that the conduct constitutes wrongdoing."  *Kimes v. Univ. of Scranton*, 126 F. Supp. 3d 477, 505 (M.D. Pa. 2015).  Because there is no argument or evidence in the record suggesting that the allegations against Chief McCurdy were found to be actual violations of the law, Scott's letter to the Borough Council regarding the perceived wrongdoings is not clearly covered by the Whistleblower law.  Therefore, Defendants are entitled to judgment as a matter of law and their motion for summary judgment on this claim will be granted.

CONCLUSION

Scott has provided sufficient evidence to establish that there is a genuine dispute of material fact such that a reasonable jury could infer that Defendants discriminated against him based on regarding him as disabled under the ADA, Defendants retaliated against him under the ADA, and Defendants retaliated against him under the First Amendment.  The motion for summary judgment will be denied on these claims.  The parties have not sufficiently addressed whether Scott is disabled under the PHRA and this claim must be resolved prior to trial. There is no genuine dispute of material fact as to Scott's FMLA claim and the Pennsylvania Whistleblower Law claim.  Defendants' motion for summary judgment will be granted on those claims.

An appropriate order will follow.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: February 20, 2024