## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT SCOTT,** | : | **CIVIL NO. 4:21-CV-1985** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **BLOSSBURG BOROUGH, SHANE** | : | |
| **NICKERSON, JOSHUA MCCURDY,** | : | |
| **PATRICK BARRETT, III,** | : | |
| | : | |
| **Defendants.** | : | |

## <u>MEMORANDUM OPINION</u>

### I.    <u>Introduction</u>

Today we perform an unusual task. We are called upon to write the final chapter in a longstanding story authored by others. We are the third judge assigned to this workplace disability discrimination and retaliation lawsuit, the case having originally been handled pretrial by our colleague Judge Wilson and then tried by our retired peer Judge Arbuckle.

Following that trial, the jury entered a verdict in favor of the plaintiff, Robert Scott, on all claims and entered a verdict totaling $669,000 in favor of Scott. (Docs. 174-75). This verdict, in turn, inspired a series of post-trial motions, including defense motions for judgment as a matter of law in the defendants' favor, (Doc. 191),

1

and for a new trial. (Doc. 192).[1] While the parties were briefing these motions, the presiding judge in the trial of their case, Judge Arbuckle, retired. These post-trial motions were then referred to the undersigned for our consideration. These motions are fully briefed and are, therefore, ripe for resolution. Upon consideration, for the reasons set forth below, these motions for new trial or for judgment notwithstanding the verdict will be denied.

## II.     Factual Background and Procedural History

### A. Procedural Background

This case involves allegations of disability discrimination and retaliation brought under federal and state law, along with a claim that the defendants retaliated against the plaintiff due to his exercise of his First Amendment free speech rights. Scott's disability discrimination claims proceeded on a "regarded as" theory; that is, Scott alleged that the defendants regarded him as mentally disabled, and discriminated against him based upon this perception, even though he had shown that he did not suffer from any ongoing disabling mental impairments. The plaintiff, Robert Scott, was a former police officer who had served Blossburg Borough for nearly seventeen years before he was discharged in 2021. The defendants are the

---

[1] The defendants have also filed a motion seeking remittitur of this damages award. (Doc. 190). We will address this motion through a separate opinion and order.

borough, its former mayor, Shane Nickerson, its chief of police, Joshua McCurdy, and the borough's solicitor, Patrick Barrett, III.

This case proceeded to trial on these legal claims between April 8 and 14, 2025. (Docs. 185, 187, 188, 189, 195). At trial, the jury was presented with two starkly different and irreconcilable factual narratives regarding the course of events which led to Scott's discharge.

For his part, Scott explained that, after an October 2020 episode in which his spouse announced her intent to leave him, he threatened self-harm. Scott promptly sought, and completed, a program of care following this isolated episode; attended a fitness for duty examination with a caregiver selected by the borough; and was cleared by three separate medical professionals to return to duty. Despite taking these steps, according to Scott, borough officials refused to clear him to return to work and refused for months to communicate with him. Instead, when Scott persisted in requesting a return to work and suggested that he was being discriminated against based upon a perceived mental disability, he contended that the borough commenced termination proceedings against him based upon his perceived mental health and other pretextual accusations of workplace misconduct.

In contrast, the defendants insisted that Scott's termination was due solely to his past insubordination and was unrelated to any perceived mental impairments on his part. However, as discussed below, the testimony of borough officials was

3

marked by inconsistencies, implausibilities, failures of recollection,[2] and halting admissions of ongoing concerns that Scott was mentally disabled even after three doctors reported that he was fit for duty.

The jury's verdict in favor of the plaintiff clearly indicated its determination that Scott's factual narrative was credible and the plaintiff had carried his burden of proof on each and every one of the claims submitted at trial.

## B. Factual Background

Fairly construed, the evidence presented trial revealed the following essential facts: By 2021, Robert Scott had committed his entire adult life to a career in law enforcement. Upon graduation from high school in 2022, Scott enrolled in a police academy. (Doc. 188 at 74). After graduation from the academy, Scott was employed part-time by the Blossburg Borough Police Department before accepting full-time employment with that department in 2012. (Id. at 76). By 2014, Scott had been promoted to corporal in this department. (Id. at 77).

While Scott's employment history at the Blossburg Police Department showed this steady career progression, in the years preceding his 2021 termination his work had been marked by several relatively minor conflicts and controversies. For example, between 2019 and 2021, Scott had experienced several run-ins with

---

[2] Indeed, we are constrained to observe that the trial transcript, and particularly the testimony of the former mayor Shane Nickerson, is riddled with instances where defense witnesses fail to recall crucial facts. (Doc. 189 at 129-216).

his superiors over a number of relatively petty matters.[3] Only one of these incidents led to any formal discipline, a 2019 letter of reprimand which was expunged from his personnel file prior to Scott's termination. Further, in the Fall of 2019, Scott and another officer had reported alleged misconduct within the police department to borough officials and other law enforcement agencies. (Doc. 187 at 32). This report apparently led to the reform of some police practices in the borough but did not result in other civil, criminal or administrative proceedings.

Scott's last day of active duty was October 7, 2020. (Doc. 188 at 79). Following work, Scott and his wife traveled to Niagara Falls where his spouse informed him that she intended to leave him. Distraught, Scott threatened self-harm. (Id. at 80). With the assistance of family and friends, Scott immediately sought assistance with his emotional crisis. He reported to Robert Packer Hospital where he

---

[3] The characterization of much of this conduct as "petty" came from the former mayor, Shane Nickerson. (Doc. 189 at 197). The evidence supports this description. For example, in 2019 it was alleged that Scott had removed tint from a car windshield without approval; had peeked at the chief's pay slip and reported an error; had entered the chief's locked office without permission to retrieve a drill; and had failed to attend a district justice hearing. In 2020, it was asserted that he moved a police car from the chief's house without permission; complained about the failure to charge the batteries on police body cameras; and reminded the chief that he was delinquent in submitting a report. In 2021, it was said that Scott used profanity in an argument with the chief and failed to respond, on occasion, to cell phone calls. (Doc. 187 at 14-25). Additionally, it was noted that for many years Scott resided outside the borough, an apparent violation of a borough ordinance. However, it seemed undisputed that the matter was known by all for years and was never deemed problematic.

received a mental health screening and was released. He then enrolled in a two-week partial in-patient program which he successfully completed. He also underwent mental health testing. (Id. at 81-89). At the completion of this treatment, on November 5, 2020, Scott's physician, Dr. Jeffrey Jacobson, cleared him to return to work on November 9, 2020. (Id. at 90).

In the immediate aftermath of this October 2020 episode, Scott sought leave due to family issues. But shortly thereafter he reported to his supervisor Police Chief McCurdy that he had undergone mental health treatment after voicing suicidal thoughts in the throes of this marital distress. (Id. at 83-85). While Scott initially viewed the response of his employer to be supportive, by November 25, 2020, the tone and tenor of his communications with borough officials changed significantly. Scott had signed HIPPA release forms allowing his employer to learn about his care, and, notwithstanding Dr. Jacobson's written medical clearance, oral communications received by Chief McCurdy from another hospital employee led borough officials to harbor concerns that Scott was mentally disabled and constituted a potential "liability." Thus, it was resolved to present Scott with a stark binary choice: resign with a severance package or undergo a fitness for duty examination with a medical practice of the borough's choosing with the understanding that if he failed the examination he would be fired, and his examination results would be reported to licensing officials.

This demand was presented to Scott at a November 25, 2020, meeting between the plaintiff, Mayor Nickerson, Chief McCurdy and the borough solicitor, Patrick Barrett. (Id. at 91-96). This meeting was described as a strained, hostile discussion: Scott was interrogated by Attorney Barrett regarding his mental health; Scott recalled being told he was a "liability"; and Scott was presented with the option of resigning or undergoing mandated testing. (Id.)

Ultimately Scott opted to undergo testing so he could return to work and was directed to make an appointment with Dr. Manning's office at Laurel Behavioral Health, a medical provider identified by Mayor Nickerson. (Id. at 98-99). Scott complied with this instruction and scheduled a January 20, 2021, appointment with PA-C Jacqueline Wiand at Laurel Behavioral Health. Following this clinical evaluation PA-C Wiand reported in writing that: "I evaluated Robert Scott today. Patient is considered stable from a psychiatric standpoint at this time. Robert has no acute risk issues, has a safety plan, and informed consent for medication treatment was given." (Id. at 106).[4] PA-C Wiand also cautioned Scott to refrain from use of

---

[4] At trial, it was agreed that the defendants chose Dr. Manning's practice for this fitness for duty examination. However, the defendants suggested that they did not deem this fitness for duty letter adequate because it did not come from the doctor. However, Mayor Nickerson conceded that the defendants never required Scott to be treated directly by Dr. Manning, (Doc 189 at 177), and the clinical records suggested that the doctor audited PA-C Wiand's medical evaluation. Further, it is undisputed that no one communicated the need for a further evaluation to Scott.

alcohol. Thus, by January 25, 2021, two medical professionals had seemingly cleared Scott to return to work, finding that he was emotionally stable.

Scott provided this requested evaluation to the borough on January 26, 2021, along with a request to be reinstated. (Id. at 108). Additionally, Scott—who had been on administrative leave for some three months—voiced a concern that he was being discriminated against because he was perceived as mentally disabled. (Id.) Borough officials did not respond to this email; nor did they reply to Scott's request to meet with the borough's police committee to discuss his return to duty. (Id.)

Yet, while borough officials met Scott's repeated requests with silence, a constellation of factors combined to indicate that, during this time, at least some borough officers perceived him as mentally disabled notwithstanding the medical clearance letters the borough received. For example, it is conceded that one borough decision-maker, Jerome Ogden, a member of the council who served on the police committee repeatedly expressed misgivings about Scott's mental state. (Doc. 188 at 233; Doc. 189 at 74, 169, 190-91; Doc. 195 at 44).[5] The characterization of Scott as a "liability" following his October 2020 self-reported medical treatment also suggested that he was regarded by some as disabled.[6] Likewise, the insistence upon

---

[5] In fact, Mr. Ogden regarded Scott as so dangerously disabled mentally that it appears he requested a police escort to avoid contact with the plaintiff. (Doc. 189 at 191).

[6] Scott clearly recalled being described as a "liability" due to his perceived mental health during a November 25, 2020, meeting with defendants Nickerson, Barrett and

8

fitness for duty evaluations, coupled with the reluctance to accept the results of those evaluations, combined to create the perception that Scott was seen by the defendants as suffering from some ongoing and medically unrecognized disability. Further, various borough officials, while denying that Scott's self-reported mental health care served as the grounds for his termination, stated, albeit reluctantly, that this episode and his mental state remained an ongoing concern. (Doc. 189 at 89, 108, 162; Doc. 195 at 19, 141). In addition. it appears that borough officials only began cataloguing Scott's alleged performance shortcoming after they learned of his brief mental health crisis, suggesting that these work issues—which had previously been treated as insignificant—provided a pretextual excuse for Scott's removal only after he was regarded as mentally disabled. (Doc. 189 at 163). Finally, the borough's decision to regard Scott as disabled was confirmed in writing by the defendants when they submitted the following explanation of their conduct to the EEOC:

> Mr. Scott, employed as a law enforcement officer, unfortunately had mental health issues unrelated to his position as a police officer, but such disability precludes him from performing his essential functions as a police officer. It is true that Mr. Scott requested a medical leave in order to address his personal mental health issues. It is important to note that he was granted all leave requested. It is equally important to note that Mr. Scott simply did not have the stability, regardless of the source, to serve in law enforcement for Blossburg Borough.

---

McCurdy. (Doc. 188 at 92). The defendants' recollection of this meeting was more confused, contradictory and vague. (Doc. 189 at 173, 253; Doc. 195 at 19). However, whether those precise words were used one thing is clear: at trial Defendant Barrett admitted that he regarded Scott as a mental health liability. (Doc. 195 at 19) ("Q. You did think he was a liability, correct? A. Probably of some sort, yes, I guess.").

(Doc. 189 at 216).

Unaware of the borough's internal deliberations, but concerned by their silence, Scott continued to treat with Laurel Behavioral Health and submitted a series of additional fitness to serve letters from that health care provider to the borough throughout February and March 2021. (Doc. 188 at 119, 123, 129). Scott also provided a letter from his primary care physician attesting to his fitness to serve. (Id. at 125). Thus, by April 2021, three medical sources had stated that Scott was fit to return to work. The borough never responded to any of these communications. Additionally, Scott attended the regular monthly borough council meetings hoping to address his reinstatement, but the issue was never raised in these public meetings. (Id. at 122-28). Following the March 2021 borough meeting, while officials were in executive session, Scott had a brief conversation with Chief McCurdy where he voiced his frustration with the lack of progress or communication and stated that he might as well go back to Florida and drink beer on the beach. (Id. at 126-27). This isolated remark later became the basis for an allegation by the borough that Scott was non-compliant with treatment recommendations.

The borough's silence regarding Scott's reinstatement came to a sudden—and for Scott shocking—end in April of 2021. As Scott prepared to attend the borough council's April meeting, he learned from a stenographer entering the building that a hearing was scheduled to discuss his termination. (Id. at 133). Scott had no prior

notice of this proposed action. When Scott confronted Attorney Barrett regarding what he perceived as an ambush by borough officials, he testified that Barrett responded in the following manner:

> When I -- when I asked him about the hearing, he told me that I get antsy, and that's what people don't like about me, and that he also stated that I should be happy that I get to sit home on my a-s-s and get paid for it.

(Id. at 135).

This statement, attributed to the borough's attorney and apparently credited by the jury, was revealing in at least two ways. First, the reference to Scott getting "antsy" confirmed that he was perceived as emotionally unstable in April of 2021. Second, the tone and tenor of the remarks displayed a stunning disregard for the emotional distress experienced by Scott as he waited for some six months to learn his fate in the career he had pursued for nearly seventeen years.

From this juncture, events proceeded rapidly. On April 14, 2021, the borough held an initial hearing over Scott's protests regarding his termination. Defendant Barrett's remarks at this April 14, 2021, hearing clearly linked Scott's discharge to perceptions that he was mentally ill since Barrett stated that it was "this incident back in the first part of October [Scott's brief mental health crisis] which brought us here." (Doc. 195 at 30). At that hearing, officials recited a series of past, and minor, transgressions, many of which occurred years before and had never resulted in any disciplinary action. Borough officials also cited factors that seemed directly related

to their perception of his mental disability, including his October 2020 suicide threat and his alleged failure to abide by medical advice to refrain from drinking as grounds for dismissal. On April 21, 2021, following this initial, surprise hearing, Scott was notified that the borough was recommending his termination. A final hearing was held on this termination at Scott's request on April 29, 2021. Scott was fired on June 9, 2021. (Doc. 188 at 133-2; Doc, 187 at 12-41).

This lawsuit followed. At trial, Scott presented evidence relating to three categories of damages that he alleged he suffered: back pay, front pay and emotional distress damages. With respect to these direct economic damages, the plaintiff presented testimony by Chad Staller a forensic accountant. Mr. Staller testified that Scott's back pay loss was $15,749.00, and his front pay losses totaled $227,476.00. (Doc. 187 at 197, 205). The jury was presented with no countervailing evidence regarding these elements of Scott's damages.

Scott also testified regarding the emotional impact of losing the only career he had ever known or ever sought, stating:

> I have been a police officer the majority of my adult life. As I testified, I entered the police academy at age 19, following in my father and my uncle's footsteps. It was my identity in an emergency/service public safety capacity that I felt I had developed myself into. To have it stripped away in a -- to be in a humiliation -- humiliated way, it was -- I can only say it was devastating. To have not only that title, that -- everything that I had worked for throughout my career, as well as put me into a financial burden where now I was scurrying to attempt to find new positions to provide for myself and my children.

(Id. at 58).

Presented with this evidence, the jury returned a verdict in Scott's favor on all of his disability discrimination and retaliation claims and awarded him the following damages: $16,000 in back pay; $228,000 in front pay; and $425,000 in emotional distress damages, for a total award of $669,000. (Docs. 174, 175).

These post-trial motions for new trial and for judgment notwithstanding the verdict followed. Notably, the defense motions are cast in a scattershot fashion, with the defendants advancing many as eighteen claims of error which they insist call for a new trial or entry of judgment in their favor as a matter of law. We have carefully considered these allegations of error, both singly and in combination, and as discussed below find them to be meritless. Therefore, the motions will be denied.

III.   **Discussion**

A. **Standards of Review: Motion for New Trial and Motion for Judgment Notwithstanding the Verdict.**

The legal benchmarks which govern motions for new trial and motions for judgment notwithstanding the verdict are familiar ones. Rule 50 of the Federal Rules of Civil Procedure governs motions for judgment notwithstanding the verdict and provides as follows:

**(a) Judgment as a Matter of Law.**

**(1)** ***In General.*** If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a

13

legally sufficient evidentiary basis to find for the party on that issue, the court may:

> **(A)** resolve the issue against the party; and
> **(B)** grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

> **(2)** *Motion.* A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

> **(b) Renewing the Motion After Trial; Alternative Motion for a New Trial.** If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

> **(1)** allow judgment on the verdict, if the jury returned a verdict;
> **(2)** order a new trial; or
> **(3)** direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50.

In order to set aside the collective wisdom of the jury and enter a judgment notwithstanding the verdict, a movant must make a particularly exacting showing. As we have observed in the past:

> Although available under the Rules, "judgment as a matter of law should be granted sparingly." Avaya Inc., RP v. Telecom Labs, Inc., 838 F.3d 354, 373 (3d Cir. 2016) (quoting Goodman v. Pa. Tpk. Comm'n, 293 F.3d 655, 665 (3d Cir. 2002)); see also Bender v. Norfolk

14

S. Corp., 31 F. Supp. 3d 659, 664 (M.D. Pa. 2014) ("Judgment as a matter of law should be used sparingly and may be granted only if, 'as a matter of law, the record is critically deficient in that minimum quantity of evidence from which a jury might reasonably afford relief.'") (quoting Whelan v. Teledyne Metalworking Prods., 226 Fed.Appx. 141, 145 (3d Cir. 2007)) (quoting Trabal v. Wells Fargo Armored Serv. Corp., 269 F.3d 243, 249 (3d Cir. 2001)).

Thus, as the Third Circuit explained in Avaya, a motion for judgment as a matter of law brought pursuant to Rule 50 should be granted only if, "viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Avaya, 838 F.3d at 373 (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)). In considering the evidence in the light most favorable to the nonmoving party, the court must also give the nonmoving party "the benefit of all reasonable inferences, even though contrary inferences might reasonably be drawn." In re Lemington Home for the Aged, 777 F.3d 620 626 (3d Cir. 2015) (citing Dudley v. S. Jersey Metal, Inc., 555 F.2d 96, 101 (3d Cir. 1977)). Additionally, a court must not make credibility determinations or weigh the evidence when considering the motion. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000). Instead, "the court should review the record as a whole, [and] it must disregard all evidence favorable to the moving party that the jury is not required to believe." Id. At the same time, the court may grant the motion "if upon review of the record, it can be said as a matter of law that the verdict is not supported by legally sufficient evidence." Borrell v. Bloomsburg Univ., No. 3:12-CV-2123, 2016 WL 4988061, at *2 (M.D. Pa. Sept. 19, 2016) (citing Parkway Garage, Inc. v. City of Phila., 5 F.3d 685, 691-92 (3d Cir. 1993)). "The question is not whether there is literally no evidence supporting the non-moving party, but whether there is evidence upon which the jury could properly find for the non-moving party." Id. at *2.

Ely v. Cabot Oil & Gas Corp., No. 3:09-CV-2284, 2017 WL 1196510, at *6 (M.D. Pa. Mar. 31, 2017).

15

Motions for new trial, in turn, are governed by Rule 59 of the Federal Rules of Civil Procedure, which states, in part, that:

> ***Grounds for New Trial.*** The court may, on motion, grant a new trial on all or some of the issues--and to any party--as follows:
>
> **(A)** after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court. . . .

Fed. R. Civ. P. 59(a).

In order to set aside a jury's verdict and obtain a new trial, a movant must satisfy specific and compelling standards. As we have noted in the past:

> The decision to grant or deny a new trial is committed to the sound discretion of the trial court and, unlike the standard used for determining judgment as a matter of law under Rule 50, the court need not view the evidence in the light most favorable to the verdict winner. See Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980); Leonard v. Stemtech Int'l Inc., 834 F.3d 376, 386 (3d Cir. 2016) (citing Olefins Trading, Inc. v. Han Yang Chem. Corp., 9 F.3d 282 (3d Cir. 1993)); see also 9A Wright & Miller, Federal Practice and Procedure § 2531 (2d ed. 1994) ("On a motion for new trial the court may consider the credibility of witnesses and the weight of the evidence.").
>
> Common reasons given for granting a new trial include "(1) the jury's verdict is against the clear weight of the evidence, and a new trial must granted to prevent a miscarriage of justice; (2) newly-discovered evidence exists that would likely alter the outcome of the trial; (3) improper conduct by an attorney or the court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent." Amgen Inc. v. Sanofi, —— F. Supp. 3d ——, 2017 WL 27253, at *3 (D. Del. Jan. 3, 2017) (citing Zarow-Smith v. N.J. Transit Rail Operations, 953 F. Supp. 581, 584-85 (D.N.J. 1997)).
>
> Recently, another court in the Middle District of Pennsylvania observed that courts have granted new trials where, *inter alia*, the verdict was against the weight of the evidence, the size of the verdict was against

16

the weight of the evidence, and where counsel engaged in improper conduct that had a prejudicial effect on the jury. See Borrell v. Bloomsburg Univ., —— F. Supp. 3d ——, 2016 WL 4988061, at *3 (M.D. Pa. Sept. 19, 2016); see also Todd v. Luzerne Cnty. Children & Youth Servs., No. 04-2637, 2011 WL 841429, at *2 (M.D. Pa. Mar. 8, 2011). A new trial may also be warranted where there has been a "showing that the jury verdict resulted from passion or prejudice." Evans v. Port Authority of New York and New Jersey, 273 F.3d 346, 352 (3d Cir. 2001).

In considering a motion for a new trial, a court should proceed with caution and remain "mindful that it should not simply substitute its own judgment of the facts and the credibility of the witnesses for those of the jury. Rather, the court should grant a new trial 'only when the great weight of the evidence cuts against the verdict and a miscarriage of justice would result if the verdict were to stand.' " Id. (quoting Leonard, 834 F.3d at 386); see also Springer v. Henry, 435 F.3d 268, 274 (3d Cir. 2006); Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1352-53 (3d Cir. 1991). "[W]here the evidence is in conflict, and subject to two or more interpretations, the trial judge should be more reluctant to grant a new trial." Klein v. Hollings, 992 F.2d 1285, 1295 (3d Cir. 1993) (citation omitted). "This limit upon the district court's power to grant a new trial seeks to ensure that a district court does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury." Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 201 (3d Cir. 1996) (quoting Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 211 (3d Cir. 1992)). Accordingly, the Third Circuit has instructed that "a District Court reviewing a jury verdict has an 'obligation ... to uphold the jury's award if there exists a reasonable basis to do so." Evans, 273 F.3d at 351-52 (quoting Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1230 (3d Cir. 1989)).

Ely v. Cabot Oil & Gas Corp., 2017 WL 1196510, at *10–11.

These legal guideposts, which caution us to uphold the jury's award if there exists a reasonable basis to do so, govern consideration of the defendants' motions in this case.

17

**B. The Defendants' Motions for New Trial and Judgment Notwithstanding the Verdict Will Be Denied.**

As we have noted, the defendants' post-trial motions proceed in a shotgun fashion, with the defendants asserting as many as eighteen claims of error which they insist now warrant judgment in their favor or, at a minimum, a new trial. This sweeping approach calls to mind the legal adage that the attorney who argues many claims possesses no good ones.

So it is here.

As we discuss below, the defendants' claims—while many and varied—share one common element. None of these allegations, considered singly or in combination, justifies setting aside the jury's verdict. Therefore, these motions will be denied.

**1. We Will Not Revisit the Denial of Defendants' Summary Judgment Motion.**

At the outset, in their post-trial motions the defendants advance a novel contention. Notwithstanding the jury's verdict finding them liable for disability discrimination and retaliation, the defendants insist that Judge Wilson erred in denying summary judgment in their favor on these claims.

We disagree.

18

Judge Wilson's thoughtful summary judgment ruling carefully canvassed the sharply conflicting and contrasting evidence regarding the defendants' intent and motivation before aptly concluding that:

> Scott has provided sufficient evidence to establish that there is a genuine dispute of material fact such that a reasonable jury could infer that Defendants discriminated against him based on regarding him as disabled under the ADA, Defendants retaliated against him under the ADA, and Defendants retaliated against him under the First Amendment.

Scott v. Borough, No. 1:21-CV-01985, 2024 WL 692209, at *15 (M.D. Pa. Feb. 20, 2024). In reaching this result the Court acknowledged a fundamental truth in summary judgment practice; namely:

> [I]t is well-settled that: "The motive or absence of motive of a party to engage in conduct alleged by another party is relevant to determining whether a genuine issue of fact exists." Berda v. CBS Inc., 800 F.Supp. 1272, 1276 (W. D. Pa), aff'd., 975 F.2d 1548 (3d Cir. 1992) citing Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 596, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Cooper v. Pennsylvania Hum. Rels. Comm'n, 578 F. Supp. 3d 649, 668 (M.D. Pa. 2022). Therefore, when questions of motive or intent are relevant to a summary judgment determination, factual disputes as to human motivation must be decided as a matter of fact and cannot be resolved as a question of law.

Here the parties presented starkly different and utterly irreconcilable views regarding what motivated the borough to fire this seventeen-year veteran of its police department. Scott asserted that he was fired in a discriminatory fashion based upon

19

the fact the defendants erroneously regarded him as mentally disabled; the defendants denied that their perceptions regarding Scott's mental impairments played any role in their decision-making. Instead, they insisted that he was fired for misconduct and insubordination. This dispute regarding motivation plainly precluded summary judgment in the defendants' favor, and the wisdom of Judge Wilson's decision denying summary judgment on these claims was underscored when the jury, which heard all of this contested evidence, concluded that Scott had proven his claims of disability discrimination and retaliation. There was no error here.

### 2.  Ample Evidence Supported the Jury's Verdict

In their post-trial motions, the defendants also launch multi-facetted challenges to the jury's verdict, arguing *inter alia* that the verdicts were unsupported by evidence showing that the borough regarded Scott as disabled; that the evidence showed as a matter of law that the borough was justified in firing Scott since he did not comply with their specific instruction to be examined by Dr. Manning; that the plaintiff failed as a matter of law to rebut the defendants' proffered non-discriminatory reason for firing him; that there was no evidence that the individual defendants played decision-making roles in Scott's termination; and that Scott failed to prove his First Amendment retaliation claim.

These fact-bound arguments warrant only brief consideration. At the outset, the defendants' motions—which simply re-argue their view of the facts in the face of a jury verdict which rejected their version of events—ignore the legal standards which control these post-trial motions. Thus, it is well-settled that a motion for judgment as a matter of law brought pursuant to Rule 50 should be granted only if, "viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." <u>Avaya</u>, 838 F.3d at 373. Likewise, when considering a Rule 59 motion for new trial "a District Court reviewing a jury verdict has an 'obligation ... to uphold the jury's award if there exists a reasonable basis to do so.'" <u>Evans</u>, 273 F.3d at 351-52. Simply put, we cannot accept the defendants' invitation to re-weigh the evidence. Rather, we must afford substantial deference to the jury's factual determinations.

Moreover, and more fundamentally, the defendants' specific attacks on the sufficiency of the evidence simply fail when one considers the proof presented at trial. For example, while the defendants insist that there is no evidence that they considered Scott mentally disabled, an essential element of a "regarded as" disability claim, we need look no further than their own statements to conclude that there was ample evidence that they regarded the plaintiff as suffering from mental disabilities.

21

In fact, they said as much when they submitted the following explanation of their

conduct to the EEOC:

> Mr. Scott, employed as a law enforcement officer, unfortunately had mental health issues unrelated to his position as a police officer, but such disability precludes him from performing his essential functions as a police officer. It is true that Mr. Scott requested a medical leave in order to address his personal mental health issues. It is important to note that he was granted all leave requested. It is equally important to note that Mr. Scott simply did not have the stability, regardless of the source, to serve in law enforcement for Blossburg Borough.

(Doc. 189 at 216).

Defendants also insist as a matter of law that they were entitled to fire Scott

because he refused their specific order to be personally examined by the physician

of their choice, Dr. Manning, in order to determine his fitness for duty. However,

there are at least three problems with this contention: First, Mayor Nickerson

conceded at trial that he never specifically instructed Scott to be seen only by Dr.

Manning. Second, Scott actually followed the instructions he was given. He

scheduled an appointment with Dr. Manning's office; was seen by PA-C Wiand,

who practiced under the doctor's supervision; and was cleared to return to work.

Finally, it is undisputed that, after the defendants received these fitness to work

letters from PA-C Wiand, they never advised Scott that he needed to be seen

personally by Dr. Manning. On these uncontested facts, Scott cannot be faulted for

failing to follow instructions he was never given. This argument fails.

22

Further, the defendants err when they suggest that Scott failed to present evidence showing that their proffered reasons for firing him—his alleged insubordination—were pretextual. On this score:

> "To show pretext, a plaintiff must 'point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.' " Wright v. Providence Care Ctr., LLC, 822 F. App'x 85, 91 (3d Cir. 2020) (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). "To meet that burden, a plaintiff cannot 'simply show that the employer's decision was wrong or mistaken.' The fact that an employer made a poor or unwise decision does not make that decision discriminatory." Ball v. Einstein Community Health Assocs., Inc., 514 F. App'x 196, 199 (3d Cir. 2013) (citations omitted); see also Wright, 822 F. App'x at 91; Curtis v. Tyco Retail Healthcare Grp., Inc., Civil Action No. 06-4302, 2008 WL 2967044, at *8 (E.D. Pa. July 31, 2008) ("To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."); Perry-Hartman v. Prudential Ins. Co. of Am., Civil Action No. 17-cv-4732, 2021 WL 3077551, at *7 (E.D. Pa. July 20, 2021) (same). "Evidence undermining an employer's proffered legitimate reasons therefore must be sufficient to support an inference that the employer did not act for its stated reasons." Ball, 514 F. App'x at 199–200 (cleaned up).

Campo v. Mid-Atl. Packaging Specialties, LLC, 564 F. Supp. 3d 362, 383–84 (E.D. Pa. 2021).

Here the jury's verdict necessarily implied that the borough's justifications for firing Scott were found to be pretextual. Substantial evidence supported this conclusion. The evidence indicated that the defendants repeatedly emphasized that

23

Scott's perceived disability drove their actions. The other workplace justifications which they later proffered for their decision to fire Scott consisted of minor alleged infractions, many of which occurred years prior to Scott's discharge, and most of which were not deemed sufficiently serious to warrant any disciplinary action when they occurred. The accumulation of these ancient grievances as grounds for firing Scott once he experienced a period of emotional distress bore all the earmarks of a *post hoc* pretextual justification for a pre-ordained decision. Moreover, it is undisputed that the defendants only began collecting these minor infractions after they learned of Scott's suicide threat in the Fall of 2020 and they began to view him as disabled. The timing of the decision to catalogue these past alleged infractions also suggested that they were pretextual. Thus, these factors, considered in combination, were, in our view, entirely sufficient to support the jury's inference that the defendants did not act for their stated non-discriminatory reasons when they fired Scott.

Nor can the individual defendants escape liability by asserting that they were not decisionmakers in this case. The jury's verdict and the evidence show that these individuals played integral roles in the process which led to the termination of Scott's law enforcement career based upon the perception that he was emotionally impaired. Moreover, the mayor and police chief were Scott's direct superiors. Having served in these supervisory roles and acted as the architects of this

employment action, the defendants may not now evade responsibility for this action by attempting to shift responsibility for the final decision onto others.[7]

Finally, in their post-trial motions the defendants argue that there was insufficient evidence to support the jury's verdict in favor of Scott on his First Amendment retaliation claim. Indeed, on this score, the defendants take an extreme view and insist that "there is *no evidence* that supports the Plaintiff's First Amendment Claim." (Doc. 201 at 33) (emphasis added). However, when we afford the verdict the degree of deference mandated by law, we find that there was an adequate evidentiary foundation for this aspect of the plaintiff's verdict.

Familiar legal standards govern First Amendment retaliation claims lodged by public employees like Mr. Scott. As our colleague Judge Mannion has observed:

> In order to establish a First Amendment retaliation claim, a public employee, . . . , must show: "(1) that his or her [activity] is protected by the First Amendment; and (2) that the [activity] was a substantial or motivating factor of the employer's retaliatory action(s). Flora v. County of Luzerne, 776 F.3d 169, 174 (3d Cir. 2015) (citing Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009)). If plaintiffs prove both elements, the burden shifts to the employer to prove that "the same action would have been taken even if the [First Amendment activity, including speech] had not occurred." Falco v. Zimmer, 767 Fed.Appx.

---

[7] The defendants also insist that there was error in the treatment of their defenses based upon the claim that Scott's condition was "transitory and minor." (Doc. 202 at 22). The precise nature of this argument is unclear, but one thing is clear: Prior to trial it was stipulated that "Defendants will not pursue a 'transitory and minor' defense at trial." (Doc. 146). Further, while there was a medical consensus that Scott's emotional condition was temporary and triggered by the dissolution of his marriage it can hardly be said that this condition—which led Scott to threaten self-destruction—was "mild."

288, 299 (3d Cir. 2019) (citations omitted). See also Flora, 776 F.3d at 174.

Lahovski v. Rush Twp., 441 F. Supp. 3d 43, 52 (M.D. Pa. 2020). Further:

> "The [Supreme] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). If public employees speak in the course of their employment, "the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 421, 126 S.Ct. 1951. However, if an employee speaks as a citizen on a matter of public concern, "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Id. at 418, 126 S.Ct. 1951.

Id.

In this case, giving appropriate deference to the jury's resolution of disputed factual questions, we find that there was sufficient evidence to sustain the verdict in favor of Scott on this First Amendment retaliation claim. At the outset, we find that when Scott publicly decried alleged serious police department misconduct in the Fall of 2019, he was addressing matters of public concern cloaked in the protections of the First Amendment. Additionally, the penalty he later suffered—termination of his employment—clearly constitutes a sufficiently severe adverse action to support a retaliation claim. Wisniewski v. Fisher, 857 F.3d 152, 157 (3d Cir. 2017) (held, "the termination of . . . employment constitutes adverse action sufficient to deter the

26

exercise of First Amendment rights, satisfying the second element of a retaliation claim . . . .”). Finally, as Scott cogently argues, (Doc. 214 at 23-32), in the course of Scott's April 2021 termination hearing, defendant Barrett elicited testimony from Chief McCurdy that a fact-finder could reasonably construe as demonstrating that Scott's public comments were a substantial and motivating favor in the chief's recommendation that the plaintiff be fired. Thus, the elements of this claim were satisfied and as we have previously noted the jury also possessed sufficient evidence to discount the defendants' non-retaliatory justification for their actions as pretextual.

In the final analysis, mindful of the fact that "a District Court reviewing a jury verdict has an 'obligation ... to uphold the jury's award if there exists a reasonable basis to do so,'" Evans, 273 F.3d at 351-52, we find that that there exists a reasonable basis grounded in the evidence for accepting the verdicts entered here by the jury. Therefore, these allegations of error fail.

### 3. **Post-trial Relief is Not Warranted Based Upon the Court's Pre-trial and Trial Rulings**

The defendants attempt to further bolster their post-trial motions by reciting a litany of pre-trial and trial rulings made in the course of this case. While these allegations of trial error are diverse, they share several elements. None of these allegations justify setting aside the verdict in this case; indeed, many of these claims border on the frivolous.

27

For example, in an argument that is almost entirely bereft of any factual support, the defendants assert that plaintiff's counsel somehow "intimidated" Judge Arbuckle into committing error. (Doc. 202 at 37-38). This contention is both risible and, frankly, irresponsible. The trial transcript, which we have reviewed, contains absolutely no evidence of this alleged intimidation and it is inconceivable that a seasoned jurist like Judge Arbuckle would be intimidated by the remarks of any attorney. In fact, there is an unintended irony to this allegation. The defendants insist that plaintiff's counsel in some fashion intimidated the Court by threatening to seek a mistrial, yet the transcript reveals that it was defense counsel who threatened a mistrial. (Doc. 185 at 87).

Likewise, defense counsel avers that the Court prejudicially impugned counsel's integrity by overruling his trial objections. (Doc. 202 at 31-33). Notably, the defendants advance this inflammatory claim without benefit of any citation to the record. This is hardly surprising since our own independent examination of the trial transcript discloses that Judge Arbuckle's rulings on evidentiary objections were fair, balanced and thoroughly professional. Thus, at various times during trial Judge Arbuckle ruled both for, and against, all counsel when they raised objections. However, in every instance the judge conducted himself in a patient, courteous and professional manner. This claim is frivolous.

In a scattershot fashion, the defendants then challenge the substance of the Court's trial rulings on evidentiary objections. (Doc. 202 at 23-25). These allegations of error are also unavailing.

At the outset, the defendants' arguments ignore the legal standards which guide the Court when making evidentiary rulings. As a general rule "evidentiary rulings are subject to the trial judge's discretion and are therefore reviewed only for abuse of discretion." Abrams v. Lightolier Inc., 50 F.3d 1204, 1213 (3d Cir. 1995). This broad discretion, in turn, informs the scope of our post-trial review of trial court evidentiary rulings. On this score:

> "A [C]ourt's latitude in ruling on the [post-trial] motion is especially broad when the grounds asserted in the motion concern matters that initially rested within the discretion of the [D]istrict [C]ourt." Jacobson ex rel. Jacobson v. BMW of N. Am., LLC, 376 Fed.Appx. 261, 264 (3d Cir.2010). "Rulings on evidentiary matters and the content of instructions to the jury are two such discretionary matters." Id. A motion for a new trial should be granted on evidentiary rulings *only* where *substantial* errors occurred in admission or rejection of evidence. Becker v. ARCO Chem. Co., 207 F.3d 176, 180 (3d Cir.2000) (emphasis added).

Univ. of Pittsburgh of Com. Sys. of Higher Educ. v. Varian Med. Sys., Inc., 877 F. Supp. 2d 294, 305 (W.D. Pa. 2012), aff'd in part, rev'd in part on other gr'ds sub nom. Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Varian Med. Sys., Inc., 561 F. App'x 934 (Fed. Cir. 2014). Thus, in order to secure post-trial relief based upon trial court evidentiary decisions, a movant must show two things: (1) and abuse of discretion and (2) some substantial prejudice.

29

In this case, the defendants have made neither of these two essential showings. First, given the broad discretion which Judge Arbuckle enjoyed when addressing evidentiary issues at trial, we find that there was no error in these rulings.[8] More fundamentally, these objections fail because the defendants have not shown any substantial prejudice to their defense which flowed from these evidentiary rulings. A showing of substantial prejudice requires some indication that the alleged error would have led to a different result at trial. Thus, we must consider the defendants'

---

[8] A few examples suffice to illustrate this point. At the outset, the defendants complain about the manner in which depositions were used by plaintiff's counsel to question borough officials. At  trial the plaintiff called these officials as hostile witnesses and used their prior deposition testimony to either refresh their recollection, impeach their trial testimony, or as substantive evidence in the form of admissions by a party-opponent. All of these uses are specifically permitted by the Federal Rules of Evidence. See Fed. R. Evid 612 (refreshing recollection); 613 (prior inconsistent statements); 801(2)(2)(admission of party opponent). Likewise, the defendants protest what they characterize as impermissible hearsay testimony by Scott, citing Scott's testimony that his extreme episode of depression was instigated by his wife's announcement that she was leaving him. This testimony though was essential context and was not offered for the truth of the matter asserted but rather to illustrate its impact upon the plaintiff a permissible purpose under the hearsay rules. In the same vein, evidence regarding media coverage of Scott's termination was relevant and admissible since it went directly to the scope of his emotional distress at being publicly labelled as emotionally unbalanced. Finally, a number of the defendants' evidentiary objections miss the mark for other reasons. For example, the defendants devote great energy to arguments involving evidentiary rulings relating to their defense that Scott violated Mayor Nickerson's specific instruction to be directly examined by Dr. Manning to ascertain his fitness for work. However, at trial Mayor Nickerson admitted that he never told Scott that he must be seen personally by Dr. Manning. (Doc 189 at 177) Given this immutable fact, the defendants cannot complain that Judge Arbuckle erred when considering evidentiary issues relating to what was ultimately a factually bankrupt defense.

complaints regarding trial rulings in the context of the evidence as a whole. When we undertake this task, we find that the defendants err in suggesting that Judge Arbuckle's rulings at trial led to this verdict. Instead, what produced this outcome and fatally hampered the defendants at trial was the inherent, internal inconsistency of their defense. The trial record is replete with evidence indicating that the defendants harbored persistent and profound concerns regarding Scott's mental state even after three doctors cleared him to return to his duties. Thus, they plainly regarded him as emotionally disabled and the decision to fire Scott seemed to flow in large measure from this misperception. Yet, the defendants denied what could readily be inferred from this evidence and instead implausibly insisted that Scott's mental state played no part in their decision to fire the plaintiff. It is this fundamental weakness in their defense, rather than any trial rulings on points of evidence, which produced the outcome which the defendants now challenge. Therefore, the defendants have not shown that they were substantially and unfairly prejudiced by these trial rulings.

Further, the defendants contend that the trial judge erred in denying defense motions *in limine* prior to trial and in excluding the testimony of two borough council members. In these motions *in limine* the defendants sought to preclude Scott from presenting evidence of emotional distress injuries and asked the Court to conclude

31

as a matter of law that the borough could not be held liable for the actions of the mayor and chief of police on a "cat's paw" theory of liability.

These allegations provide no grounds for post-trial relief. At the outset, the trial judge properly denied the motion *in limine* which sought to preclude Scott from recovering compensatory damages since courts have permitted the recovery of pain and suffering damages in ADA cases, including emotional distress damages. See Gagliardo v. Connaught Lab'ys, Inc., 311 F.3d 565, 573 (3d Cir. 2002). Moreover, as we have noted, Scott's testimony regarding how the defendants' actions stripped him of the only career he had known and the identity he had sought as a police officer certainly supported a claim for emotional distress damages. Likewise, the trial judge correctly concluded that the defendants were not entitled to a pre-trial ruling limiting how Scott might pursue claims of institutional liability against the borough based upon the actions of the mayor, chief of police or borough solicitor.

Nor did the trial judge err in excluding the testimony of two putative defense witnesses at trial. On this score, Judge Arbuckle found that:

> Defendants admit that the . . . contested witnesses were first listed as "witnesses" for the defense on February 12, 2025, two years after the close of fact discovery and a year after summary judgment was decided. They were not listed in the initial Rule 26 disclosure, or in response to interrogatories or a reply to the Plaintiff's deficiency letter.

(Doc. 139 at 6). Given this uncontested failure to timely disclose these witnesses, the trial judge retained the discretion to exclude their testimony at trial since: "A

32

party's failure to disclose 'a witness as required by Rule 26(a) or (e)' may result in the preclusion of that witness 'unless the failure was substantially justified or is harmless.' Fed. R. Civ. P. 37(c)(1)." In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., & Prods. Liab. Litig., No. MDL 16-2738 (MAS) (RLS), 2025 WL 1385222, at *4 (D.N.J. May 13, 2025). Since this decision rested in the trial judge's sound discretion, we would not set aside the jury's verdict on these grounds.

### 4. The Trial Judge's Jury Instructions and Jury Management Does Not Warrant Post-trial Relief

Finally, in their motions the defendants catalogue a series of complaints relating to jury instructions and jury management which they assert require us to set aside this verdict. However, these allegations, like the prior assertions of error, are unpersuasive.

In considering these final assertions of error we are constrained to note at the outset that the defendants' claims rest, in part, upon an apparent misstatement of fact. Among the issues raised by the defense is a claim of misconduct relating to what the defendants describe as an "unfiled" jury question. (Doc. 201 at 15; Doc. 202 at 10). The defendants' insistence on describing this note as "unfiled" or "not contained in the record" seems calculated to imply some sinister connotation, some element of concealment.

This factual averment is incorrect. The docket clearly contains the jury question and answer. (Doc. 170). Moreover, that question and answer were part of

33

the record in this case when the defendants filed their post-trial briefs, making their factual misstatement particularly puzzling.

In any event, as we discuss below, none of these allegations relating to jury instructions or jury management warrant relief. With respect to jury instructions and jury management the defendants launch a litany of allegations including assertions: (1) that the court permitted improper opening statements by plaintiff's counsel; (2) that the court's curative instructions were unfairly prejudicial; (3) that the final jury instructions were prejudicially flawed; (4) that the verdict form did not provide a clear claim by claim pathway for the jury;  and (5) that the Court gave an improper answer to a jury question. Yet, upon consideration none of these claims of error withstand close scrutiny.

Turning first to the defendants' concerns regarding counsel's opening statement and closing argument:

> "[W]e recognize that not all improper remarks will engender sufficient prejudice to mandate the granting of a new trial. Our test is whether the improper assertions have made it 'reasonably probable' that the verdict was influenced by prejudicial statements.

Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 207 (3d Cir. 1992). Adopting this approach, which mandates a showing of a reasonable probability that counsel's statements influenced the verdict, it has been held that isolated comments by counsel do not warrant post-trial relief. Salas by Salas v. Wang, 846 F.2d 897, 908 (3d Cir. 1988).

In this case, the isolated comments by plaintiff's counsel cited by the defendants in their motion (Doc. 202 at 35-37) simply do not meet these exacting legal benchmarks justifying post-trial relief. In fact, many of these statements seem fully supported by the evidence or relate to comments based upon exhibits whose admissibility was agreed to by the parties. There was no error here and certainly no error which made it "reasonably probable" that the verdict was influenced by counsel's statements.

The defendants also protest various curative instructions given by Judge Arbuckle in the course of this trial and contend that the final instructions given to the jury were unfairly prejudicial. In considering these claims we begin with the proposition that:

> The trial court has broad discretion in the composition of jury instructions, as long as they are fundamentally accurate and not misleading. Owens, 50 F.3d at 1233 (citing Harrison v. Otis Elevator Corp., 935 F.2d 714, 717 (5th Cir.1991)). The court is required to exercise special care not to invade upon the fact-finding role of the jurors. United States v. Ayeni, 374 F.3d 1313, 1320–21 (D.C.Cir.2004). Because the decision how to compose the jury instructions is one in which the court has broad discretion, the court has especially broad discretion in considering a motion for a new trial which complains that the court erred in its initial determination. See Klein, 992 F.2d at 1289–90.

Dean v. Specialized Sec. Response, 876 F. Supp. 2d 549, 556 (W.D. Pa. 2012). Therefore, to sustain this claim the defendants must show that Judge Arbuckle either

35

abused his discretion or committed legal error in his jury instructions in order to obtain relief.

In this case the defendants specifically complain about three brief excerpts from the court's jury instructions. (Doc. 195 at 25-26). First, the defendants assert that Judge Arbuckle erred in giving the jury curative instructions which advised them that a psychological test, an MMPI exam, that was referenced at trial was not in evidence. Additionally, the defendants complained that the trial judge improperly instructed the jury that: "No medical evidence or testimony was presented in this case that Mr. Scott suffered from either alcohol abuse or substance abuse." (Id.) Finally, the defendants, who state that they abandoned any direct threat defense at trial protested that Judge Arbuckle told the jury: "You are not being asked to consider whether Mr. Scott was a direct threat, as this is a legal concept not before you for your determinations." (Id.)

In our view, there was no error in these jury instructions. Certainly, Judge Arbuckle cannot be faulted for advising the jury that they should not speculate about matters not in evidence. As for the instructions regarding Scott's use of alcohol, there was no evidence indicating that Scott was fired due to excessive drinking or had been diagnosed as suffering from drug or alcohol abuse. Quite the contrary, Scott alleged that he was fired because he was erroneously regarded as mentally disabled. The defendants, in turn, insisted that they terminated his employment due to

36

workplace misconduct. Given the way in which the parties framed these issues, the question of Scott's alcohol use only arose elliptically, in the context of an allegation that Scott may have failed to follow medical recommendations to refrain from alcohol use. Therefore, the suggestion that Scott abused alcohol was potentially prejudicial since it would inject a factually unsupported peripheral issue into the heart of this case. Judge Arbuckle's curative instructions recognized and appropriately addressed this potential confusion by focusing the jury's attention on the pivotal issues in this case and simply stating that there was no evidence that Scott suffered from either alcohol abuse or substance abuse. This instruction was factually correct, and legally appropriate.

Finally, the defendants' complaints that they were prejudiced by Judge Arbuckle's instruction to the jury that "You are not being asked to consider whether Mr. Scott was a direct threat, as this is a legal concept not before you for your determinations," are completely unpersuasive. While there had been some allusions to direct threats at trial, the defendants concede that they had abandoned any direct threat defense. Therefore, fairly construed, Judge Arbuckle's instruction simply restated the defendants' position on this issue for the jury. No unfair prejudice could have flowed from Judge Arbuckle's accurate statement of this aspect of the defense.

Finally, our review of the instructions, taken as a whole, disclose that they presented the controlling legal principles that governed the jury's deliberations in a

clear, cogent fashion. Therefore, any broadly framed and vaguely defined defense objections to these instructions also fail.

Likewise, the defendants' objections to the verdict form are misplaced. While the defendants assert in a cursory manner that the verdict form did not provide a clear claim by claim pathway for the jury, the facts belie this claim. Fairly read, that verdict form took the jury carefully through a sequential analysis of the claims, parties and defenses. (Docs. 174, 175). At each stage the jury was required to make findings regarding whether the plaintiff had proven some components of his case before progressing to the next step in their verdict. Thus, the verdict form did precisely what the defendants demanded: It provided a claim by claim pathway for the jury. Accordingly, at bottom the defendants' objections do not relate to the form of this verdict. Rather, what they protest is the substance of the verdict which found them liable and awarded damages totaling $669,000 in damages. However, that outcome was a function of the jury's assessment of the evidence; it was not the result of a fatally flawed verdict form.

Finally, the defendants argue that Judge Arbuckle erred in responding to a note from the jury. As we previously observed, this argument rests in part upon a factual misstatement, the defendants' erroneous insistence that the question and answer were not included in the trial record. In fact, the question and answer are clearly set forth on the docket. (Doc. 170). The jury's question asked for clarification

of the phrase determinative effect of the materially adverse employment action. (Id.) Judge Arbuckle's response to this question referred the jury to his written instructions and further advised them "determinative effect" meant that Mr. Scott's protected activity made a difference to their decision. (Id.) No one contends that this response prejudicially misstated the law in a way which prejudiced the defense and in fact the guidance appears to have been entirely appropriate. See Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 256 (3d Cir. 2006). Indeed, the defendants even concede "that this issue, standing alone, may be insufficient" to warrant post-trial relief. (Doc. 201 at 37). We agree.

In closing we recognize that Robert Scott's sudden, but transitory, emotional crisis may have presented the defendants with choices and decisions that they were ill-equipped by training and temperament to address. We also acknowledge, as Scott conceded, that initially the defendants appeared to display empathy for the plaintiff who was experiencing severe emotional turmoil. But the jury's verdict also reflects their conclusion that over time the defendants' fears overcame their empathy. That verdict reveals a finding that the defendants perceived Scott as mentally disabled and could not be dissuaded from the view by three medical opinions clearing him to return to duty. Eventually the jury found that the defendants' unsupported fears that the plaintiff was disabled, and their resentment of Scott's past complaints, played a material role in the decision to fire Scott from the only career he knew. Substantial

evidence supports these findings and our respect for the wisdom of the jury system now requires all parties to accept this verdict.

## IV.    <u>Conclusion</u>

For the foregoing reasons, the defendants' motions for judgment notwithstanding the verdict and new trial (Docs. 191 and 192)  will be denied.

An appropriate order follows.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: March 30, 2026