# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT SCOTT,** | : | **CIVIL NO. 4:21-CV-1985** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **BLOSSBURG BOROUGH, SHANE** | : | |
| **NICKERSON, JOSHUA MCCURDY,** | : | |
| **PATRICK BARRETT, III,** | : | |
| | : | |
| **Defendants.** | : | |

## <u>MEMORANDUM OPINION</u>

### I.   <u>Introduction</u>

Today we perform an unusual task. We are called upon to write the final chapter in a longstanding story authored by others. We are the third judge assigned to this workplace disability discrimination and retaliation lawsuit, the case having originally been handled pretrial by our colleague Judge Wilson and then tried by our retired peer Judge Arbuckle.

Following that trial, the jury entered a verdict in favor of the plaintiff, Robert Scott, on all claims and entered a verdict totaling $669,000 in favor of Scott. (Docs. 174-75). This verdict, in turn, inspired a series of post-trial motions, including

1

defense motions to alter and amend this judgment, (Doc. 190), for judgment as a matter of law in the defendants' favor, (Doc. 191), and for a new trial. (Doc. 192).

While the parties were briefing these motions, the presiding judge in the trial of their case, Judge Arbuckle, retired. These post-trial motions were then referred to the undersigned for our consideration. These motions are fully briefed and are, therefore, ripe for resolution. Turning to the defendants' motion to alter and amend the jury's judgment, (Doc. 190), which requests that we enter an order granting a remittitur reducing the jury's verdict, for the reasons set forth below, this motion will be granted in part and denied in part as follows: the plaintiff's back pay award of $16,000.00 will be reduced to $15,749.00 and the plaintiff's front pay award of $228,000.00 will be reduced to $227,476.00 in order to conform with the evidence. In all other respects the motion will be denied.

## II.    Factual Background and Procedural History

### A. Procedural Background

This case involves allegations of disability discrimination and retaliation brought under federal and state law, along with a claim that the defendants retaliated against the plaintiff due to his exercise of his First Amendment free speech rights. Scott's disability discrimination claims proceeded on a "regarded as" theory; that is, Scott alleged that the defendants regarded him as mentally disabled, and discriminated against him based upon this perception, even though he had shown

that he did not suffer from any ongoing disabling mental impairments. The plaintiff, Robert Scott, was a former police officer who had served Blossburg Borough for nearly seventeen years before he was discharged in 2021. The defendants are the borough, its former mayor, Shane Nickerson, its chief of police, Joshua McCurdy, and the borough's solicitor, Patrick Barrett, III.

This case proceeded to trial on these legal claims between April 8 and 14, 2025. (Docs. 185, 187, 188, 189, 195). At trial, the jury was presented with two starkly different and irreconcilable factual narratives regarding the course of events which led to Scott's discharge.

For his part, Scott explained that after an October 2020 episode in which his spouse announced her intent to leave him, he threatened self-harm. Scott promptly sought, and completed, a program of care following this isolated episode; attended a fitness for duty examination with a caregiver selected by the borough; and was cleared by three separate medical professionals to return to duty. Despite taking these steps, according to Scott, borough officials refused to clear him to return to work and refused for months to communicate with him. Instead, when Scott persisted in requesting a return to work and suggested that he was being discriminated against based upon a perceived mental disability, he contended that the borough commenced termination proceedings against him based upon his perceived mental health and other pretextual accusations of workplace misconduct.

3

In contrast, the defendants insisted that Scott's termination was due solely to his past insubordination and was unrelated to any perceived mental impairments on his part. However, as discussed below, the testimony of borough officials was marked by inconsistencies, implausibilities, failures of recollection,[1] and halting admissions of ongoing concerns that Scott was mentally disabled even after three doctors reported that he was fit for duty.

The jury's verdict in favor of the plaintiff clearly indicated its determination that Scott's factual narrative was credible and the plaintiff had carried his burden of proof on each and every one of the claims submitted at trial.

### B. Factual Background

The evidence presented trial revealed the following essential facts: By 2021, Robert Scott had committed his entire adult life to a career in law enforcement. Upon graduation from high school in 2022, Scott enrolled in a police academy. (Doc. 188 at 74). After graduation from the academy, Scott was employed part-time by the Blossburg Borough Police Department before accepting full-time employment with that department in 2012. (Id. at 76). By 2014, Scott had been promoted to corporal in this department. (Id. at 77).

---

[1] Indeed, we are constrained to observe that the trial transcript, and particularly the testimony of the former mayor Shane Nickerson, is riddled with instances where defense witnesses fail to recall crucial facts. (Doc. 189 at 129-216).

While Scott's employment history at the Blossburg Police Department showed this steady career progression, in the years preceding his 2021 termination his work had been marked by several relatively minor conflicts and controversies. For example, between 2019 and 2021, Scott had experienced several run-ins with his superiors over a number of relatively petty matters.[2] Only one of these incidents led to any formal discipline, a 2019 letter of reprimand which was expunged from his personnel file prior to Scott's termination. Further, in the Fall of 2019, Scott and another officer had reported alleged misconduct within the police department to borough officials and other law enforcement agencies. (Doc. 187 at 32). This report apparently led to the reform of some police practices in the borough but did not result in other civil, criminal or administrative proceedings.

---

[2] The characterization of much of this conduct as "petty" came from the former mayor, Shane Nickerson. (Doc. 189 at 197). The evidence supports this description. For example, in 2019 it was alleged that Scott had removed tint from a car windshield without approval; had peeked at the chief's pay slip and reported an error; had entered the chief's locked office without permission to retrieve a drill; and had failed to attend a district justice hearing. In 2020, it was asserted that he moved a police car from the chief's house without permission; complained about the failure to charge the batteries on police body cameras; and reminded the chief that he was delinquent in submitting a report. In 2021, it was said that Scott used profanity in an argument with the chief and failed to respond, on occasion, to cell phone calls. (Doc. 187 at 14-25). Additionally, it was noted that for many years Scott resided outside the borough, an apparent violation of a borough ordinance. However, it seemed undisputed that the matter was known by all for years and was never deemed problematic.

Scott's last day of active duty was October 7, 2020. (Doc. 188 at 79). Following work, Scott and his wife traveled to Niagara Falls where his spouse informed him that she intended to leave him. Distraught, Scott threatened self-harm. (Id. at 80). With the assistance of family and friends, Scott immediately sought assistance with his emotional crisis. He reported to Robert Packer Hospital where he received a mental health screening and was released. He then enrolled in a two-week partial in-patient program which he successfully completed. He also underwent mental health testing. (Id. at 81-89). At the completion of this treatment, on November 5, 2020, Scott's physician, Dr. Jeffrey Jacobson, cleared him to return to work on November 9, 2020. (Id. at 90).

In the immediate aftermath of this October 2020 episode, Scott sought leave due to family issues. But shortly thereafter he reported to his supervisor Police Chief McCurdy that he had undergone mental health treatment after voicing suicidal thoughts in the throes of this marital distress. (Id. at 83-85). While Scott initially viewed the response of his employer to be supportive, by November 25, 2020, the tone and tenor of his communications with borough officials changed significantly. Scott had signed HIPPA release forms allowing his employer to learn about his care, and, notwithstanding Dr. Jacobson's written medical clearance, oral communications received by Chief McCurdy from another hospital employee led borough officials to harbor concerns that Scott was mentally disabled and constituted

6

a potential "liability."  Thus, it was resolved to present Scott with a stark binary choice: resign with a severance package or undergo a fitness for duty examination with a medical practice of the borough's choosing with the understanding that if he failed the examination he would be fired, and his examination  results would be reported to licensing officials.

This demand was presented to Scott at a November 25, 2020, meeting between the plaintiff, Mayor Nickerson, Chief McCurdy and the borough solicitor,  Patrick Barrett. (Id. at 91-96). This meeting was described as a strained, hostile discussion: Scott was interrogated by Attorney Barrett regarding his mental health; Scott recalled being told he was a "liability"; and Scott was presented with the option of resigning or undergoing mandated testing. (Id.)

Ultimately Scott opted to undergo testing so he could return to work and was directed to make an appointment with Dr. Manning's office at Laurel Behavioral Health, a medical provider identified by Mayor Nickerson. (Id. at 98-99). Scott complied with this instruction and scheduled a January 20, 2021, appointment with PA-C Jacqueline Wiand at Laurel Behavioral Health. Following this clinical evaluation PA-C Wiand reported in writing that: "I evaluated Robert Scott today. Patient is considered  stable from a psychiatric standpoint at this time. Robert has no acute risk  issues, has a safety plan, and informed consent for medication treatment

was given." (Id. at 106).[3] PA-C Wiand also cautioned Scott to refrain from use of alcohol. Thus, by January 25, 2021, two medical professionals had seemingly cleared Scott to return to work, finding that he was emotionally stable.

Scott provided this requested evaluation to the borough on January 26, 2021, along with a request to be reinstated. (Id. at 108). Additionally, Scott—who had been on administrative leave for some three months—voiced a concern that he was being discriminated against because he was perceived as mentally disabled. (Id.) Borough officials did not respond to this email; nor did they reply to Scott's request to meet with the borough's police committee to discuss his return to duty. (Id.)

Yet, while borough officials met Scott's repeated requests with silence, a constellation of factors combined to indicate that during this time at least some borough officers perceived him as mentally disabled notwithstanding the medical clearance letters the borough received. For example, it is conceded that one borough decision-maker, Jerome Ogden, a member of the council who served on the police committee repeatedly expressed misgivings about Scott's mental state. (Doc. 188 at

---

[3] At trial, it was agreed that the defendants chose Dr. Manning's practice for this fitness for duty examination. However, the defendants suggested that they did not deem this fitness for duty letter adequate because it did not come from the doctor. However, Mayor Nickerson conceded that the defendants never required Scott to be treated directly by Dr. Manning, (Doc 189 at 177), and the clinical records suggested that the doctor audited PA-C Wiand's medical evaluation. Further, it is undisputed that no one communicated the need for a further evaluation to Scott.

8

233, Doc. 189 at 74, 169, 190-91, Doc. 195 at 44).[4] The characterization of Scott as a "liability" following his October 2020 self-reported medical treatment also suggested that he was regarded by some as disabled.[5] Likewise, the insistence upon fitness for duty evaluations, coupled with the reluctance to accept the results of those evaluations, combined to create the perception that Scott was seen by the defendants as suffering from some ongoing and medically unrecognized disability. Further, various borough officials, while denying that Scott's self-reported mental health care served as the grounds for his termination, stated, albeit reluctantly, that this episode and his mental state remained an ongoing concern. (Doc. 189 at 89, 108, 162, Doc. 195 at 19, 141). In addition. it appears that borough officials only began cataloguing Scott's alleged performance shortcoming after they learned of his brief mental health crisis, suggesting that these work issues—which had previously been treated as insignificant—provided a pretextual excuse for Scott's removal only after he was regarded as mentally disabled. (Doc. 189 at 163). Finally, the borough's decision to

---

[4] In fact, Mr. Ogden regarded Scott as so dangerously disabled mentally that it appears he requested a police escort to avoid contact with the plaintiff. (Doc. 189 at 191).

[5] Scott clearly recalled being described as a "liability" due to his perceived mental health during a November 25, 2020 meeting with defendants Nickerson, Barrett and McCurdy. (Doc. 188 at 92). The defendants' recollection of this meeting was more confused, contradictory and vague. (Doc. 189 at 173, 253, Doc. 195 at 19). However, whether those precise words were used one thing is clear: at trial Defendant Barrett admitted that he regarded Scott as a mental health liability. ("you did think he was a liability, correct? A. Probably of some sort, yes, I guess." Doc. 195 at 19).

regard Scott as disabled was confirmed in writing by the defendants when they submitted the following explanation of their conduct to the EEOC:

> Mr. Scott, employed as a law enforcement officer, unfortunately had mental health issues unrelated to his position as a police officer, but such disability precludes him from performing his essential functions as a police officer. It is true that Mr. Scott requested a medical leave in order to address his personal mental health issues. It is important to note that he was granted all leave requested. It is equally important to note that Mr. Scott simply did not have the stability, regardless of the source, to serve in law enforcement for Blossburg Borough.

(Doc. 189 at 216).

Unaware of the borough's internal deliberations, but concerned by their silence, Scott continued to treat with Laurel Behavioral Health and submitted a series of additional fitness to serve letters from that health care provider to the borough throughout February and March 2021. (Doc. 188 at 119, 123, 129). Scott also provided a letter from his primary care physician attesting to his fitness to serve. (Id. at 125). Thus, by April 2021, three medical sources had stated that Scott was fit to return to work. The borough never responded to any of these communications. Additionally, Scott attended the regular monthly borough council meetings hoping to address his reinstatement, but the issue was never raised in these public meetings. (Id. at 122-28). Following the March 2021 borough meeting, while officials were in executive session, Scott had a brief conversation with Chief McCurdy where he voiced his frustration with the lack of progress or communication and stated that he might as well go back to Florida and drink beer on the beach. (Id. at 126-27). This

isolated remark later became the basis for an allegation by the borough that Scott was non-compliant with treatment recommendations.

The borough's silence regarding Scott's reinstatement came to a sudden—and for Scott shocking—end in April of 2021. As Scott prepared to attend the borough council's April meeting, he learned from a stenographer entering the building that a hearing was scheduled to discuss his termination. (Id. at 133). Scott had no prior notice of this proposed action. When Scott confronted Attorney Barrett regarding what he perceived as an ambush by borough officials, he testified that Barrett responded in the following manner:

> When I -- when I asked him about the hearing, he told me that I get antsy, and that's what people don't like about me, and that he also stated that I should be happy that I get to sit home on my a-s-s and get paid for it.

(Id. at 135).

This statement, attributed to the borough's attorney and apparently credited by the jury, was revealing in at least two ways. First, the reference to Scott getting "antsy" confirmed that he was perceived as emotionally disabled in April of 2021. Second, the tone and tenor of the remarks displayed a stunning disregard for the emotional distress experienced by Scott as he waited for some six months to learn his fate in the career he had pursued for nearly seventeen years.

From this juncture, events proceeded rapidly. The borough held an initial hearing over Scott's protests regarding his termination. Defendant Barrett's remarks

at this April 14, 2021 hearing clearly linked Scott's discharge to perceptions that he was mentally ill since Barrett stated that it was "this incident back in the first part of October [Scott's brief mental health crisis] which brought us here." (Doc. 195 at 30). At that hearing officials recited a series of past, and minor, transgressions, many of which occurred years before and had never resulted in any disciplinary action. Borough officials also cited factors that seemed directly related to their perception of his mental disability, including his October 2020 suicide threat and his alleged failure to abide by medical advice to refrain from drinking as grounds for dismissal. On April 21, 2021, following this initial, surprise hearing, Scott was notified that the borough was recommending his termination. A final hearing was held on this termination at Scott's request on April 29, 2021. Scott was fired on June 9, 2021. (Doc. 188 at 133-2; Doc, 187 at 12-41).

This lawsuit followed. At trial, Scott presented evidence relating to three categories of damages that he alleged he suffered: back pay, front pay and emotional distress damages. With respect to these direct economic damages, the plaintiff presented testimony by Chad Staller a forensic accountant. Mr. Staller testified that Scott's back pay loss was $15,749.00, and his front pay losses totaled $227,476.00. (Doc. 187 at 197, 205). The jury was presented with no countervailing evidence regarding this element of Scott's damages.

Scott also testified regarding the emotional impact of losing the only career he had ever known or ever sought, stating:

> I have been a police officer the majority of my adult life. As I testified, I entered the police academy at age 19, following in my father and my uncle's footsteps. It was my identity in an emergency/service public safety capacity that I felt I had developed myself into. To have it stripped away in a -- to be in a humiliation -- humiliated way, it was -- I can only say it was devastating. To have not only that title, that -- everything that I had worked for throughout my career, as well as put me into a financial burden where now I was scurrying to attempt to find new positions to provide for myself and my children.

(Id. at 58).

Presented with this evidence, the jury returned a verdict in Scott's favor on all of his disability discrimination and retaliation claims and awarded him the following damages: $16,000 in back pay; $228,000 in front pay; and $425,000 in emotional distress damages, for a total award of $669,000. (Docs. 174, 175).

These post-trial motions followed, including the instant motion seeking a remittitur of this damages award. As discussed below, this motion will be granted in part and denied in part as follows: the plaintiff's back pay award of $16,000.00 will be reduced to $15,749.00 and the plaintiff's front pay award of $228,000.00 will be reduced to $227,476.00 in order to conform with the evidence. In all other respects the motion will be denied.

## III.    Discussion

### A. Rule 59(e) Motion and Remittitur: Standards of Review.

In the instant case, the defendants have filed a motion to alter and amend the jury's verdict and judgment awarding $669,000 in damages to Scott. In this motion the defendants essentially invite us to exercise our authority to grant a remittitur of this verdict and substitute a lower amount of damages for the damages awarded by the jury.

The defendants face an exacting burden of proof and persuasion in advancing this argument that we should set aside the jury's verdict. To be sure: "Under Rule 59(e), a party may seek alteration or amendment of the verdict." Borrell v. Bloomsburg Univ., 207 F. Supp. 3d 454, 471 (M.D. Pa. 2016). However, the legal benchmarks which govern motions to alter or amend judgments are exacting. Thus, at the outset "Rule 59(e) permits motions to amend or alter a judgment and may be granted to submit new, previously undiscovered evidence or to correct a clear error of law or prevent manifest injustice." Gutierrez v. Gonzales, 125 F. App'x 406, 417 (3d Cir. 2005) (citing North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir.1995); Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir.1985)).

These guiding principles, which confine motions to alter or amend verdicts to instances where  amendment of the verdict is necessary to prevent manifest injustice

14

clearly call for the exercise of restraint when considering remittitur requests. On this score, "[t]he use of remittitur 'clearly falls within the discretion of the trial judge, whose decision cannot be disturbed by this court absent a manifest abuse of discretion.'" Evans v. Port Auth. of New York & New Jersey, 273 F.3d 346, 354 (3d Cir. 2001) (quoting Spence v. Bd. of Educ. of the Christina Sch. Dist., 806 F.2d 1198, 1200 (3d Cir.1986)). However, in the exercise of this discretion we are cautioned that:

> "The rationalization for, and use of, the remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive." Spence v. Bd. of Educ. of Christina Sch. Dist., 806 F.2d 1198, 1201 (3d Cir.1986)(citing Kazan v. Wolinski, 721 F.2d 911 (3d Cir.1983); Keystone Floor Products Co., Inc. v. Beattie Mfg. Co., 432 F.Supp. 869 (E.D.Pa.1977)). "A jury verdict which is 'so grossly excessive as to shock the judicial conscience' can be the basis for either a new trial or remittitur" and the "[v]erdicts that shock the judicial conscience are those that bear no rational relationship to the evidence presented." Glass v. Snellbaker, 2008 WL 4371760, at *6 (D.N.J. Sept. 17, 2008) (Simandle, J.)(citing Gumbs v. Pueblo Int'l, Inc., 823 F.2d 768, 773 (3d Cir.1987); Williams v. Martin Marietta Alumina, Inc., 817 F.2d 1030, 1038 (3d Cir.1987)).

Borrell v. Bloomsburg Univ., 207 F. Supp. 3d 454, 471 (M.D. Pa. 2016).

By limiting remittiturs to instances in which verdicts shock the conscience, caselaw recognizes a cardinal principle in our system of justice: respect for the collective wisdom of the jury. Further, given the respect which is owed to the jury's verdict, when considering requests for remittitur of any verdict "this court may not require a reduction in the amount of the verdict to less than the 'maximum recovery'

15

that does not shock the judicial conscience." Gumbs v. Pueblo Int'l, Inc., 823 F.2d 768, 774 (3d Cir. 1987).

These legal tenets guide us in examining the defendants' motion for remittitur.

### B. **The Motion for Remittitur Will Be Granted in Part and Denied in Part.**

The defendants have launched a threefold attack upon the jury's verdict in this case, arguing that the verdict is excessive and wrong as a matter of arithmetic; as a matter of law; and as a matter of the proper exercise of judicial discretion. As discussed below, we agree with the defendants' arithmetic contentions, and will modestly adjust the front- and back-pay verdicts accordingly to conform with the evidence. However, we decline to find legal error in the jury's overall award and conclude that the jury's compensatory damages award, while robust, is not conscience shocking. Therefore, we decline the invitation to reduce the jury's verdict on these grounds.

### 1. **The Front- and Back-Pay Verdicts Will be Adjusted to Conform with the Proof**.

Turning first to the defendants' arithmetic concerns, this aspect of their motion focusses on the jury's front-and back-pay awards. As to this element of damages, the pertinent facts can be simply stated. The plaintiff presented testimony by Chad Staller a forensic accountant. Mr. Staller testified that Scott's back pay loss was $15,749.00 and his front pay losses totaled $227,476.00. (Doc. 187 at 197, 205).

16

The jury was presented with no countervailing evidence regarding this element of Scott's damages. The jury then returned verdicts of $16,000 in back pay and $228,000 in front pay. Given the arithmetic aspect of these damage calculations, and the uncontested evidence capping these damages at $15,749.00 in back pay and front pay losses of $227,476.00, we believe it is appropriate to strictly conform these damages to the proof at trial. Therefore, the plaintiff's back pay award of $16,000.00 will be reduced to $15,749.00 and the plaintiff's front pay award of $228,000.00 will be reduced to $227,476.00.

## 2. **The Defendants' Legal Challenge to the Overall Verdict is Denied**.

In addition, the defendants argue as a matter of law that the jury's verdict on these disability-based claims is excessive. Citing 42 U.S.C. §1981a, the defendants insist that, as a legal matter, in ADA cases Congress has prescribed that: "in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000" is the maximum allowable damage award. 42 U.S.C. § 1981a (b)(3)(A). Noting that the borough's staffing fell within this limit, the defendants invite us to limit this damages award to $50,000.

This argument warrants only brief consideration. While the borough correctly states the law with respect to claims brought exclusively under the ADA, the borough's argument ignores an immutable, but stubborn, fact: Scott brought suit

17

both under the ADA and under the parallel provisions of the Pennsylvania Human Relations Act. This is a significant legal distinction since the Third Circuit has held "that § 1981a does not prevent a claimant from recovering greater damages under a state law claim that is virtually identical to a capped federal claim." Gagliardo v. Connaught Lab'ys, Inc., 311 F.3d 565, 570 (3d Cir. 2002). Thus, "[t]he fact that the PHRA does not contain a damages cap . . . indicates that it was intended to provide a remedy beyond its federal counterpart, the ADA." Id. at 570–71. Simply put, in this setting "the Court of Appeals for the Third Circuit has directed district courts to maximize jury awards to plaintiffs." Gucker v. U.S. Steel Corp., 212 F. Supp. 3d 549, 561 (W.D. Pa. 2016). Thus, when presented with claims brought bought under the ADA and the PHRA, courts frequently apportion compensatory damages between the two parallel claims rather than truncate the state and federal awards to the total prescribed by Section 1981a. See e.g.,Middlebrooks v. Teva Pharms. USA, Inc., No. CV 17-412, 2019 WL 438092, at *22 (E.D. Pa. Feb. 4, 2019); Gucker, 212 F. Supp. 3d at 561; Tamburo v. Ross/W. View Emergency Med. Servs. Auth., No. 2:04-CV-1237, 2007 WL 1175633, at *2 (W.D. Pa. Apr. 20, 2007).

This is the course we will follow here. Accordingly, after properly molding the verdict and allocating damages between state and federal claims as we are instructed to do the defendants' legal challenge to this jury award premised on Section 1981a is denied.

### 3. <u>We Will Decline to Reduce this Verdict as Conscience Shocking.</u>

Finally, the defendants invite us to exercise our inherent discretionary power of remittitur to reduce the jury's verdict, arguing that the emotional distress compensatory damages award of $425,000 is conscience shocking.

We disagree and will decline this invitation.

While this decision rests in our sound discretion, we are cautioned to only set aside jury verdicts when those verdicts shock the conscience. In this case, properly construed, the verdict, while robust, is not conscience shocking. On this score, one relevant factor in evaluating the emotional distress component of a verdict is the enduring nature of the emotional impact of the defendants' actions. Thus, "where there was testimony of lasting impacts on the plaintiff," this Court has found that substantial damages are entirely appropriate. <u>Borrell v. Bloomsburg Univ.</u>, 207 F. Supp. 3d 454, 486 (M.D. Pa. 2016) (approving award of $250,000). Applying this principle, courts have sustained emotional distress damage awards similar to those found by the jury in this case. <u>See e.g.</u>, <u>Jones v. Pennsylvania State Police</u>, 794 F. App'x 177, 181 (3d Cir. 2019) (denying remittitur $250,000 emotional damage verdict); <u>Braden v. Lockheed Martin Corp.</u>, No. CV 14-4215(RMB/JS), 2017 WL 6447867, at *19 (D.N.J. Dec. 18, 2017) ($520,000 in emotional distress damages). Indeed, in such cases even courts which have remitted some emotional distress damages have arrived at final verdicts which mirror the outcome in this case. <u>See</u>

19

<u>Evans v. Port Auth. of New York & New Jersey</u>, 273 F.3d 346, 356 (3d Cir. 2001) (affirming remittitur of emotional distress damages and upholding award of $375,000).

The defendants' motion for remittitur fails to acknowledge this guiding principle and, in our view, trivializes Scott's emotional distress. In particular, defendants fail to acknowledge that by labelling Scott as emotionally disabled, they effectively destroyed the career he had spent seventeen years building. While the defendants may not fully recognize the devastating life-long emotional impact of their actions, the jury did, and we are not prepared to find this judgment conscience shocking. This request for a discretionary remittitur will be denied.[6]

---

[6] Another consideration cautions against interfering with the jury's emotional distress verdict in this case. Juries assess distress in a holistic fashion. They consider not only what is said, but the demeanor and deportment of the witnesses. It is altogether just and proper that they do so since demeanor is compelling evidence of distress. In this case the jury had the opportunity to not only hear Scott's testimony but, crucially, assess his demeanor. After undertaking this task, the jury placed a value of $425,000 on the life-long distress that Scott suffered when he lost the only career that he knew. That decision doubtless reflected the jury's evaluation of Scott's words-but more importantly his demeanor. We have no way of independently assessing this crucial evidentiary factor since we did not preside over this trial. Therefore, given that "damages for emotional distress are difficult to quantify," <u>Borrell v. Bloomsburg Univ.</u>, 207 F. Supp. 3d 454, 486 (M.D. Pa. 2016), we should not presume on a cold record to better understand the measure of Scott's distress and substitute our judgment for that of the jury.

## IV.    Conclusion

For the foregoing reasons, the defendants' motion for remittitur will be granted in part and denied in part as follows: the plaintiff's back pay award of $16,000.00 will be reduced to $15,749.00 and the plaintiff's front pay award of $228,000.00 will be reduced to $227,476.00 in order to conform with the evidence. In all other respects the motion will be denied.

An appropriate order follows.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: March 30, 2026